[No. S037992. Crim. No. 22646. Apr. 2, 1998.]

In re JOHN GEORGE BROWN on Habeas Corpus

COUNSEL

Donald Etra, Michael M. Crain and Rowan K. Klein, under appointments by the Supreme Court, Sidley & Austin, William Archer, Mark Anchor Albert, Joel K. Liberson and Robert A. Holland for Petitioner.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, William M. Wood, Garrett B. Beaumont and Robert M. Foster, Deputy Attorneys General, for Respondent.

OPINION

BROWN, J.—

## I. INTRODUCTION

Petitioner John George Brown was convicted of capital murder, the underlying facts of which are fully recounted in *People* v. *Brown* (1988) 46 Cal.3d 432 [250 Cal.Rptr. 604, 758 P.2d 1135] (*Brown I*). Briefly, petitioner shot and killed Garden Grove Police Officer Donald Reed. Reed and several other officers were pursuing him as he was leaving the Cripple Creek Bar. (*Id.* at p. 440.) Upon reaching the exit, petitioner turned and fired eight shots, killing Reed and seriously wounding two other officers and two civilians. Once outside the bar, he hid in some bushes where he was located two hours later. The probable murder weapon, a .22-caliber semiautomatic handgun, was found nearby. At trial, petitioner asserted a defense of diminished capacity, claiming he had been under the influence of methamphetamine. (*Id.* at p. 441; see former Pen. Code, § 22.) The prosecution rebutted this claim with evidence a sample of his blood had tested negative for any drugs. (*Brown I, supra,* 46 Cal.3d at p. 441.)

A jury convicted petitioner of first degree murder and found true the special circumstance allegation of intentionally killing a peace officer engaged in the performance of his duties. (Pen. Code, § 190.2, subd. (a)(7).) Following penalty phase evidence, the jury determined the punishment should be death. (*Brown I, supra,* 46 Cal.3d at pp. 441-442.) On automatic appeal, this court affirmed the judgment.

Thereafter, petitioner sought a writ of habeas corpus, alleging the prosecution committed *Brady* error[1] in failing to disclose that the result of a radioactive immunoassay (RIA) of his blood sample had been positive for phencyclidine (PCP). The negative results introduced at trial were based on gas chromatography mass spectrometry (GC/MS) testing.

We issued an order to show cause. Because of factual conflicts raised by respondent's return, we ordered a reference hearing to resolve the following questions:

Did the prosecution disclose the positive PCP finding to petitioner, his investigator, or his counsel before or during trial?

Did the positive PCP finding from the RIA test indicate that there was PCP or a PCP analog in petitioner's blood at the time of the crimes? If so, did the subsequent negative PCP finding from the GC/MS test establish that there was no PCP or PCP analog in petitioner's blood at the time of the crimes? How can the results of the two tests be reconciled?

Having considered the record of the hearing and petitioner's original trial in light of controlling United States Supreme Court authority, we conclude the prosecution failed to disclose material exculpatory evidence and, therefore, now grant relief.

## II. DISCUSSION

### A. *Nondisclosure*

#### 1. *Factual findings*

On the disclosure question, the evidence at the reference hearing established that the Orange County Sheriff-Coroner, Department of Forensic Science Services (the crime lab), which tested petitioner's blood, utilized a multipage form to record the results of its toxicological examination. The top page, on which lab personnel recorded the GC/MS result, was referred to as the "result sheet." The bottom page, with the RIA result, was designated the "worksheet." At the time petitioner's blood was tested, the standard procedure of the crime lab upon completion of the toxicology work was to send a copy of the result sheet to the prosecutor and defense counsel; for reasons of laboratory protocol, however, a copy of the worksheet was sent only on specific request. According to Frank Fitzpatrick, the chief criminalist responsible for management of the crime lab clerical staff at the time, notations on petitioner's worksheet indicated to him a copy had been sent to

---

[1] *Brady* v. *Maryland* (1963) 373 U.S. 83 [83 S.Ct. 1194, 10 L.Ed.2d 215] (*Brady*).

Deputy Public Defender Michael Beecher on October 16, 1980, via county messenger.

Michael Beecher, who represented petitioner from the preliminary hearing through November 1980 when he became advisory counsel, testified that on October 16, 1980, he telephoned the crime lab to request information on petitioner's blood testing and received a copy of the result sheet the next day. He had no recollection, file notation, or other indication he ever requested or received a copy of the worksheet. Petitioner's trial counsel, Daye Shinn, also testified he did not receive or see a copy of the worksheet before or during trial, nor did petitioner or his investigator.[2] The prosecutor also was unaware of the document until it was brought to his attention in conjunction with the present proceedings. The referee examined the case files of the public defender, the district attorney, and the Garden Grove Police Department and found no copy of the worksheet in any of them.

With respect to our first question, the referee found the witnesses on both sides credible, but ultimately concluded "the evidence preponderates that the documentation, including the positive RIA finding, was freely available, disclosed and duly forwarded to defense counsel before trial, as requested." He also determined there was no evidence "any police agency or the District Attorney withheld or concealed information." Petitioner objects to these and related findings as unsupported by the record. We need not definitively resolve his objections for the more fundamental reason that these findings do not accurately respond to the specific question posed in our reference order—did *the prosecution* disclose the RIA result *to petitioner or anyone acting on his behalf?* Relevant to this query, the referee impliedly found the prosecutor had no knowledge of the worksheet and thus could not have disclosed it. The referee also drew "a reasonable inference that [the worksheet] was not received" by Beecher based on testimony he was unaware of its existence. The uncontradicted evidence also confirms neither petitioner nor Shinn ever saw the document, and the referee makes no findings, express or implied, to the contrary.

As we explain, these latter findings are determinative. Responsibility for *Brady* compliance lies exclusively with the prosecution, including the "duty to learn of any favorable evidence known to the others acting on the government's behalf in the case." (*Kyles* v. *Whitley* (1995) 514 U.S. 419, 437 [115 S.Ct. 1555, 1567, 131 L.Ed.2d 490] (*Kyles*).) Whatever the reason for failing to discharge that obligation, the prosecution remains accountable for the consequence. (*Id.* at pp. 437-438 [115 S.Ct. at pp. 1567-1568].)

---

[2]Before the appointment of Shinn, petitioner represented himself for approximately one year and filed a formal discovery motion requesting all laboratory reports.

## 2. *Governing legal principles*

■ Pursuant to *Brady, supra,* 373 U.S. 83, the prosecution must disclose material exculpatory evidence whether the defendant makes a specific request (*id.* at p. 87 [83 S.Ct. at pp. 1196-1197]), a general request, or none at all (*United States* v. *Agurs* (1976) 427 U.S. 97, 107 [96 S.Ct. 2392, 2399, 49 L.Ed.2d 342] (*Agurs*)). The scope of this disclosure obligation extends beyond the contents of the prosecutor's case file and encompasses the duty to ascertain as well as divulge "any favorable evidence known to the others acting on the government's behalf . . . ." (*Kyles, supra,* 514 U.S. at p. 437 [115 S.Ct. at p. 1567].) Courts have thus consistently "decline[d] 'to draw a distinction between different agencies under the same government, focusing instead upon the "prosecution team" which includes both investigative and prosecutorial personnel.' " (*United States* v. *Auten* (5th Cir. 1980) 632 F.2d 478, 481.)[3] "A contrary holding would enable the prosecutor 'to avoid disclosure of evidence by the simple expedient of leaving relevant evidence to repose in the hands of another agency while utilizing his access to it in preparing his case for trial,' [citation]." (*Martinez* v. *Wainwright, supra,* 621 F.2d at p. 188; *United States* ex rel. *Smith* v. *Fairman* (7th Cir. 1985) 769 F.2d 386, 391-392.) Thus, "whether the nondisclosure was a result of negligence or design, it is the responsibility of the prosecutor. The prosecutor's office is an entity and as such it is the spokesman for the Government." (*Giglio* v. *United States* (1972) 405 U.S. 150, 154 [92 S.Ct. 763, 766, 31 L.Ed.2d 104]; *Kyles, supra,* 514 U.S. at p. 439 [115 S.Ct. at p. 1568].)

As a concomitant of this duty, any favorable evidence known to the others acting on the government's behalf is imputed to the prosecution. "The individual prosecutor is presumed to have knowledge of all information gathered in connection with the government's investigation." (*U.S.* v. *Payne* (2d Cir. 1995) 63 F.3d 1200, 1208 (*Payne*); see *Smith* v. *Secretary Dept. of Corrections, supra,* 50 F.3d at pp. 824-825, and cases cited therein.) The Supreme Court recently reiterated this principle: "whether the prosecutor succeeds or fails in meeting this obligation [to learn of favorable evidence]

---

[3]See, e.g., *Smith* v. *Secretary Dept. of Corrections* (10th Cir. 1995) 50 F.3d 801, 824 ("the prosecution" extends to law enforcement personnel and other arms of the state involved in investigative aspects); *U.S.* v. *Brooks* (D.C. Cir. 1992) 966 F.2d 1500, 1503 [296 App.D.C. 219] (*Brooks*) (duty to investigate based on "close working relationship" between police and United States Attorney); *U.S.* v. *Osorio* (1st Cir. 1991) 929 F.2d 753, 761 (*Osorio*) ("The prosecutor charged with discovery obligations cannot avoid finding out what 'the government' knows, simply by declining to make reasonable inquiry of those in a position to have relevant knowledge."); *Carey* v. *Duckworth* (7th Cir. 1984) 738 F.2d 875, 878 ("[A] prosecutor's office cannot get around *Brady* by keeping itself in ignorance, or compartmentalizing information about different aspects of a case."); *Martinez* v. *Wainwright* (5th Cir. 1980) 621 F.2d 184, 186 ("The duty to produce requested evidence falls on the state; there is no suggestion in *Brady* that different 'arms' of the government are severable entities. [Citation.]").

(whether, that is, a failure to disclose is in good faith or bad faith, [citation]), the prosecution's responsibility for failing to disclose known, favorable evidence rising to a material level of importance is inescapable." (*Kyles, supra,* 514 U.S. at pp. 437-438 [115 S.Ct. at pp. 1567-1568]; see also *Giglio* v. *United States, supra,* 405 U.S. at p. 154 [92 S.Ct. at p. 766].)[4]

### 3. *Application to the facts*

■ In this case, the uncontroverted record confirms that neither petitioner nor anyone acting on his behalf received a copy of the worksheet. At the reference hearing, Fitzpatrick acknowledged the lab "worked closely with the District Attorney's Office in assisting it in the prosecution of cases"; and there is no serious dispute that in these circumstances it was part of the investigative "team." The prosecutor thus had the obligation to determine if the lab's files contained any exculpatory evidence, such as the worksheet, and disclose it to petitioner. Whether or not he actually did examine the files, the lab personnel's knowledge is imputed.

In *United States* ex rel. *Smith* v. *Fairman, supra,* 769 F.2d 386, an investigating officer examined a gun the defendant allegedly used to shoot at two police officers and commit a robbery. The day after the shooting, the investigator recorded on a firearms worksheet that he found the gun inoperable. (*Id.* at p. 389.) When he prepared his official report, however, he failed to include this information "because the only bullets found at the scene had been fired from [one of the officers'] gun[s]"; "it was departmental procedure only to report the results of a match between the bullets recovered from the scene of a crime and the guns submitted for testing." (*Id.* at pp. 389-390, fn. omitted.) The firearms report was placed in the investigator's files and not disclosed to the prosecutor or the defendant. Although the prosecutor had no actual knowledge of the information, the reviewing court found *Brady* error in light of the "closely aligned" working relationship between the investigating officer and the prosecution. (*Id.* at p. 391.) "We believe that the purposes of *Brady* would not be served by allowing material exculpatory evidence to be withheld simply because the police, rather than the prosecutors, are responsible for the nondisclosure. [Citation.] . . . The fact that the prosecutor in this case was blameless therefore does not justify the State's failure to produce [the] firearms worksheet." (*Id.* at pp. 391-392.)

Any other rule would leave the defendant's due process rights to the fortuity of a subordinate agency's procedural protocol, which the Supreme

---

[4]See, e.g., *In re Malone* (1996) 12 Cal.4th 935, 977, fn. 22 [50 Cal.Rptr.2d 281, 911 P.2d 468]; *People* v. *Little* (1997) 59 Cal.App.4th 426, 433 [68 Cal.Rptr.2d 907]; *Smith* v. *Secretary Dept. of Corrections, supra,* 50 F.3d at pages 824-825; *U.S.* v. *Buchanan* (10th Cir. 1989) 891 F.2d 1436, 1442; *U.S.* v. *Endicott* (9th Cir. 1989) 869 F.2d 452, 455; *United States* ex rel. *Smith* v. *Fairman, supra,* 769 F.2d at page 391; *Carey* v. *Duckworth, supra,* 738 F.2d at pages 877-878; *United States* v. *Ragen* (N.D.Ill. 1949) 86 F.Supp. 382, 387.

Court has squarely rejected. "[A]ny argument for excusing a prosecutor from disclosing what he does not happen to know about boils down to a plea to substitute the police for the prosecutor, and even for the courts themselves, as the final arbiters of the government's obligation to ensure fair trials." (*Kyles, supra,* 514 U.S. at p. 438 [115 S.Ct. at p. 1568].) Similarly in this case, the crime lab's failure to apprise the prosecution of the worksheet did not relieve the prosecutor of his obligation to review the lab's files for exculpatory evidence. Thus, he remained ultimately responsible when the defense did not receive a copy.

Nor would the crime lab's attempt to transmit the worksheet be sufficient to satisfy the prosecutor's obligation. Such a result would be fundamentally at odds with the due process imperatives of the disclosure rule. The principles *Brady* and its progeny embody are not abstractions or matters of technical compliance. (Cf. *United States* v. *Leon* (1984) 468 U.S. 897 [104 S.Ct. 3405, 82 L.Ed.2d 677].) The sole purpose is to ensure the defendant has all available exculpatory evidence to mount a defense. To that end, a document sent but not received is as useless as a document not sent at all. In both situations, the right to a fair trial is equally denied. A comparable situation arose in *United States* v. *Consolidated Laundries Corporation* (2d Cir. 1961) 291 F.2d 563, in which, "[t]hrough unexplained acts, certain of the [material exculpatory documents] in the Government's custody were misplaced and consequently were not shown to defendants when inspection was ordered. This failure to produce deprived the defendants of evidence which would have been helpful to them . . . . For practical purposes the [documents] were temporarily lost. We hold this was negligence chargeable to the prosecution." (*Id.* at p. 570.)

Equally important, the Supreme Court has unambiguously assigned the duty to disclose solely and exclusively to the prosecution; those assisting the government's case are no more than its agents. (*Kyles, supra,* 514 U.S. at p. 438 [115 S.Ct. at p. 1568]; *Giglio* v. *United States, supra,* 405 U.S. at p. 154 [92 S.Ct. at p. 766]; *Fero* v. *Kerby* (10th Cir. 1994) 39 F.3d 1462, 1472, fn. 12.) By necessary implication, the duty is nondelegable at least to the extent the prosecution remains responsible for any lapse in compliance. Since the prosecution must bear the consequences of its own failure to disclose (see, e.g., *U.S.* v. *Ellis* (4th Cir. 1997) 121 F.3d 908, 914 (*Ellis*); *United States* v. *Consolidated Laundries Corporation, supra,* 291 F.2d at p. 570), a fortiori, it must be charged with any negligence on the part of other agencies acting in its behalf (*Fero* v. *Kerby, supra,* 39 F.3d at p. 1472, fn. 12; cf. *Ellis, supra,* 121 F.3d at p. 914 [defense counsel's failure to renew request for witness statements at trial does not discharge prosecution's *Brady* obligation]; *U.S.* v. *Alvarez* (9th Cir. 1996) 86 F.3d 901, 905 (*Alvarez*) [delegating to nonattorney police officer responsibility to determine if officers' rough notes contain

*Brady* material deemed "problematic"]; *Walker* v. *City of New York* (2d Cir. 1992) 974 F.2d 293, 299 ["It is appropriate that the prosecutors, who possess the requisite legal acumen, be charged with the task of determining which evidence constitutes *Brady* material that must be disclosed to the defense. A rule requiring the police to make separate, often difficult, and perhaps conflicting, disclosure decisions would create unnecessary confusion."]). Accordingly, the risk and consequences of nonreceipt must fall to the prosecution.

Despite any seeming unfairness to the prosecution, no other result would satisfy due process in this context. "The principle . . . is not punishment of society for misdeeds of a prosecutor but avoidance of an unfair trial to the accused." (*Brady, supra,* 373 U.S. at p. 87 [83 S.Ct. at p. 1197]; *Kyles, supra,* 514 U.S. at pp. 437-438 [115 S.Ct. at pp. 1567-1568]; *Smith* v. *Phillips* (1982) 455 U.S. 209, 219 [102 S.Ct. 940, 947, 71 L.Ed.2d 78]; see *Agurs, supra,* 427 U.S. at p. 110 [96 S.Ct. at p. 2401] [Constitutional error under *Brady* results from "the character of the evidence, not the character of the prosecutor."].) Declining to hold the state "accountable under *Bagley* and *Brady* for evidence known only to police investigators and not to the prosecutor . . . would . . . amount to a serious change of course from the *Brady* line of cases." (*Kyles, supra,* 514 U.S. at p. 438 [115 S.Ct. at p. 1568], fn. omitted.) "[T]he prosecutor has ready access to a veritable storehouse of relevant facts and, within the ambit of constitutional, statutory and jurisprudential directives, this access must be shared 'in the interests of inherent fairness . . . to promote the fair administration of justice.' [Citation.] If disclosure were excused in instances where the prosecution has not sought out information readily available to it, we would be inviting and placing a premium on conduct unworthy of representatives of the [government]." (*United States* v. *Auten, supra,* 632 F.2d at p. 481.) As one court has expressed it: "We suspect the courts' willingness to insist on an affirmative duty of inquiry may stem primarily from a sense that an inaccurate conviction based on government failure to turn over an easily turned rock is essentially as offensive as one based on government non-disclosure. [Citation.]" (*Brooks, supra,* 966 F.2d at p. 1503.)

"In the State's favor it may be said that no one doubts that police investigators sometimes fail to inform a prosecutor of all they know. But neither is there any serious doubt that 'procedures and regulations can be established to carry [the prosecutor's] burden and to insure communication of all relevant information on each case to every lawyer who deals with it.' [Citation.]" (*Kyles, supra,* 514 U.S. at p. 438 [115 S.Ct. at p. 1568]; see, e.g., *United States* ex rel. *Smith* v. *Fairman, supra,* 769 F.2d at p. 390 & fn. 1; *Carey* v. *Duckworth, supra,* 738 F.2d at p. 878 & fn. 4.) Thus, while the

Constitution does not impose a duty "to allow complete discovery of [the prosecutor's] files as a matter of routine practice" (*Agurs, supra,* 427 U.S. at p. 109 [96 S.Ct. at p. 2400]), the Supreme Court has on more than one occasion urged "the careful prosecutor" to err on the side of disclosure and, by necessary extension, thorough examination of investigative files. (*Kyles, supra,* 514 U.S. at p. 440 [115 S.Ct. at p. 1569]; *Agurs, supra,* 427 U.S. at p. 108 [96 S.Ct. at pp. 2399-2400]; *Giglio* v. *United States, supra,* 405 U.S. at p. 154 [92 S.Ct. at p. 766]; see *Alvarez, supra,* 86 F.3d at p. 905.)

Although rigorous, we do not perceive the duty imposed by *Brady* as too onerous. (Cf. *In re Littlefield* (1993) 5 Cal.4th 122, 135 [19 Cal.Rptr.2d 248, 851 P.2d 42] [cataloguing extent of prosecution's obligation to disclose in discovery context].) "Obviously some burden is placed on the shoulders of the prosecutor when he is required to be responsible for those persons who are directly assisting him in bringing an accused to justice. But this burden is the essence of due process of law. It is the State that tries a man, and it is the State that must insure that the trial is fair." (*Moore* v. *Illinois* (1972) 408 U.S. 786, 809-810 [92 S.Ct. 2562, 2575, 33 L.Ed.2d 706] (conc. and dis. opn. of Marshall, J.); *Alvarez, supra,* 86 F.3d at p. 905.)[5] This obligation serves "to justify trust in the prosecutor as 'the representative . . . of a sovereignty . . . whose interest . . . in a criminal prosecution is not that it shall win a case, but that justice shall be done.'" (*Kyles, supra,* 514 U.S. at p. 439 [115 S.Ct. at p. 1568], quoting *Berger* v. *United States* (1935) 295 U.S. 78, 88 [55 S.Ct. 629, 633, 79 L.Ed. 1314]; *United States* v. *Auten, supra,* 632 F.2d at p. 481.) It also tends "to preserve the criminal trial, as distinct from the prosecutor's private deliberations [or some other agency's independent assessment of materiality], as the chosen forum for ascertaining the truth about criminal accusations. [Citations.]" (*Kyles, supra,* 514 U.S. at p. 440 [115 S.Ct. at p. 1568]; *Alvarez, supra,* 86 F.3d at p. 905.)

Here, as in most circumstances, *Brady* compliance demanded no more than simple advertence. The evidence was readily accessible to the prosecution. A cursory review of the crime lab's file would have revealed the existence of the RIA test result. At the reference hearing, the prosecutor acknowledged that he would have promptly divulged the information had he been aware of it. Regardless of the reason, he failed to do so. Under established constitutional principles, we thus resolve the threshold inquiry as to disclosure in petitioner's favor.

---

[5]"Of course the prosecutor's own interest in avoiding surprise at trial gives him a very considerable incentive to search accessible files for possibly exculpatory evidence, quite independent of *Brady.*" (*Brooks, supra,* 966 F.2d at pp. 1502-1503; *Osorio, supra,* 929 F.2d at p. 761.)

B.  *Materiality of the RIA test*

In light of this conclusion, we turn to the question of materiality, for not every nondisclosure of favorable evidence denies due process. ■ "[S]uch suppression of evidence amounts to a constitutional violation only if it deprives the defendant of a fair trial. Consistent with 'our overriding concern with the justice of the finding of guilt,' [citation] a constitutional error occurs, and the conviction must be reversed, only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial." (*United States* v. *Bagley* (1985) 473 U.S. 667, 678 [105 S.Ct. 3375, 3381, 87 L.Ed.2d 481] (*Bagley*).)

1.  *Factual findings*

■ With respect to the differing RIA and GC/MS test results, the evidence at the reference hearing established that the crime lab utilized the RIA as a screening mechanism for PCP and PCP analogs. Because in 1980 the process had certain limitations, scientific protocol required confirmation of a positive result by GC/MS testing. Dr. Vina Spiehler, an expert who testified for respondent, explained that various circumstances, such as cross-reactivity (detection of some other drug) or flaking (incomplete precipitation before final analysis) as well as operator error, could cause the RIA to produce a false positive. In Spiehler's experience, such a false positive could account for a discrepancy between RIA and GC/MS test results. A disparity might also arise in two other situations: if the concentration of PCP in the test sample were below the cutoff standard for the GC/MS, or if the sample contained a PCP analog. Because the GC/MS process is drug-specific, it would require the use of a different standard to confirm the presence of an analog. Based on her research and experience, Spiehler opined that the probability "a positive RIA actually represented PCP in that sample" was 37 percent.[6] Spiehler's testimony substantially corresponded to that of Dr. Ferris Pitts, petitioner's expert.

Notes recorded by Bonnie Driver, the criminalist who performed the testing of petitioner's blood, indicated she used a 25-nanogram-per-milliliter calibration standard when she ran the GC/MS test. According to Fitzpatrick, the cutoff "[c]ertainly [was] far below 25 nanograms. Possibly as low as ten nanograms." However, in her declaration submitted in support of respondent's return, Driver states, "At this time I am unable to say if the cutoff level was 10 ng or below." In Pitts's opinion, only the graph printouts run on

---

[6]The precise basis, statistical or otherwise, of this calculation is unclear from the record. However, Spiehler incorporated into her probability determination data reflecting a 98 percent correlation between RIA and GC/MS results, both positive and negative.

the standard and blanks used to calibrate the GC/MS test would establish the cutoff. Those printouts were unavailable and had apparently been destroyed by the crime lab. According to Pitts, the RIA was generally more sensitive than the GC/MS test and could detect PCP "[s]ometimes as low as one or two nanograms, per milliliter in the original blood sample" (the equivalent of 0.000001 gram per liter). Spiehler also testified experts in the field "thought it might be possible to detect as little as . . . two nanograms [of PCP] per milliliter [by RIA] . . . ."

In response to our series of questions concerning the differing test results, the referee's findings focused on the RIA's function as a screening mechanism and the possibility of false positives. He also adopted Spiehler's probability analysis. The referee concluded the GC/MS result "show[ed] that PCP was not detectable in petitioner's blood" because printout graphs did not have any "mass points" (numerical indications of the test sample's chemical structure) at the appropriate ion levels. According to his findings, a mass point would also appear if a PCP analog were present because it "would be expected to have the same 'backbone' as PCP."

The referee reconciled the differing results by essentially discounting the RIA as a false positive due to the "inherent unreliability of the test . . . ." Because the GC/MS test was "more reliable and precise" and its result was "considered final" by the crime lab, the "negative" finding for PCP or PCP analogs was the more accurate. Accordingly, in answer to our predicate questions he found the positive RIA did not indicate there was PCP or an analog in petitioner's blood at the time of the crimes and the subsequent negative GC/MS established there was not PCP or an analog in his blood.

Petitioner objects to these findings as inaccurate, and we find the objections well taken to the following extent. Nothing in the record establishes the RIA is inherently unreliable. In fact, both experts testified that studies had shown a 98 percent correspondence between RIA and GC/MS testing. Furthermore, since the GC/MS test is in fact more "precise," i.e., specific, for PCP, it could not conclusively negate the presence of a PCP analog— particularly one that did not share sufficient molecular characteristics with PCP. Spiehler testified some analogs have a "different psychalic structure in the backbone," which would not show up on a GC/MS run for PCP. Also contrary to the referee's finding, we find no evidence "blanks and standards" established the GC/MS cutoff level "possibly as low as" 10 nanograms per milliliter. Driver's declaration did not support this conclusion, and it appears undisputed the printout graphs for the blanks and standards had been lost or destroyed.

While we do not discount the referee's ultimate findings, they are incomplete with respect to the questions posed in our reference order. The differing results can be reconciled on several bases that do not exclude the

possibility each test was accurate. If the amount of PCP were below the GC/MS cutoff, the RIA could produce a positive because it is a more sensitive testing procedure. Or, if the substance were an analog that the GC/MS PCP standard would not detect, the RIA would produce a positive result because it is intended to test not only for PCP but for analogs as well, which number over 100. In either situation, the RIA would establish the presence of PCP or an analog in petitioner's blood, and the negative GC/MS would not invalidate that determination. Spiehler also acknowledges that GC/MS testing produces false negatives. The record contains no basis for concluding any one of these explanations for the discrepancy was less likely than the one identified by the referee.

### 2. *Governing legal principles*

■ The current standard of review for *Brady* materiality was first articulated in *Bagley, supra,* 473 U.S. 667, although the United States Supreme Court began developing it in earlier decisions.[7] (See *Agurs, supra,* 427 U.S. at p. 112 [96 S.Ct. at pp. 2401-2402]; *Giglio* v. *United States, supra,* 405 U.S. at p. 154 [92 S.Ct. at p. 766].) Recently in *Kyles, supra,* 514 U.S. 419, the court reemphasized four aspects articulated in *Bagley* critical to proper analysis of *Brady* error. First, "[a]lthough the constitutional duty is triggered by the potential impact of favorable but undisclosed evidence, a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal (whether based on the presence of reasonable doubt or acceptance of an explanation for the crime that does not inculpate the defendant). [Citations.] *Bagley*'s touchstone of materiality is a 'reasonable probability' of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." (*Id.* at p. 434 [115 S.Ct. at pp. 1565-1566].)

Second, "it is not a sufficiency of evidence test. A defendant need not demonstrate that after discounting the inculpatory evidence in light of the

---

[7]In the course of this development, the court has identified three situations in which the *Brady* rule applies, including what it refers to as the "specific request" and the "no request" or "general request" cases. (See *Bagley, supra,* 473 U.S. at pp. 678-681 [105 S.Ct. at pp. 3381-3383].) The "reasonable probability" standard applies in each of these circumstances. (*Id.* at p. 682 [105 S.Ct. at p. 3383].) In the third situation, previously undisclosed evidence reveals the prosecution introduced trial testimony that it knew or should have known was perjured. (See *Agurs, supra,* 427 U.S. at pp. 103-104 [96 S.Ct. at pp. 2397-2398].) Because the use of perjured or false testimony not only denies due process but "involve[s] a corruption of the truth-seeking function of the trial process" (*id.* at p. 104 [96 S.Ct. at p. 2397]), the *Chapman* (*Chapman* v. *California* (1967) 386 U.S. 18 [87 S.Ct. 824, 17 L.Ed.2d 705, 24 A.L.R.3d 1065]) harmless error standard of review applies. (*Bagley, supra,* 473 U.S. at p. 679, fn. 9 [105 S.Ct. at p. 3382].)

undisclosed evidence, there would not have been enough left to convict. The possibility of an acquittal on a criminal charge does not imply an insufficient evidentiary basis to convict. One does not show a *Brady* violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." (*Kyles, supra,* 514 U.S. at pp. 434-435 [115 S.Ct. at p. 1566], fn. omitted.)

Third, "once a reviewing court applying *Bagley* has found constitutional error there is no need for further harmless-error review." (*Kyles, supra,* 514 U.S. at p. 435 [115 S.Ct. at p. 1566].) The one subsumes the other. (*Id.* at pp. 435-436 [115 S.Ct. at pp. 1566-1567].)

Fourth, while the tendency and force of undisclosed evidence is evaluated item by item, its cumulative effect for purposes of materiality must be considered collectively. (*Id.* at pp. 436-437 & fn. 10 [115 S.Ct. at p. 1567]; see also *Agurs, supra,* 427 U.S. at p. 112 [96 S.Ct. at p. 2402], fn. omitted [omission "must be evaluated in the context of the entire record"].)

In *Bagley*, the court identified another relevant consideration in noting that "an incomplete response to a specific [*Brady*] request not only deprives the defense of certain evidence, but also has the effect of representing to the defense that the evidence does not exist. In reliance on this misleading representation, the defense might abandon lines of independent investigation, defenses, or trial strategies that it otherwise would have pursued." (*Bagley, supra,* 473 U.S. at p. 682 [105 S.Ct. at p. 3384].) Given this possibility, "under the ['reasonable probability'] formulation the reviewing court may consider directly any adverse effect that the prosecutor's failure to respond might have had on the preparation or presentation of the defendant's case. The reviewing court should assess the possibility that such effect might have occurred in light of the totality of the circumstances and with an awareness of the difficulty of reconstructing in a post-trial proceeding the course that the defense and the trial would have taken had the defense not been misled by the prosecutor's incomplete response." (*Id.* at p. 683 [105 S.Ct. at p. 3384]; see, e.g., *Payne, supra,* 63 F.3d at p. 1209.)

### 3. *Application to the facts*

In assessing the materiality of the RIA test result, we begin with the pivotal fact that even without it petitioner offered a diminished capacity defense in an effort to persuade the jury he lacked the ability to premeditate and deliberate at the time of the shooting. Although at trial the claim was based on methamphetamine intoxication, both Beecher and Shinn testified at

the reference hearing that the positive RIA test would have refocused the defense on PCP intoxication or some combination of the two. The record establishes that the following evidence could have been adduced in support of that defense with reasonable follow-up on the positive RIA.[8]

Petitioner had an extensive history of drug abuse including PCP. According to Dr. Kaushal Sharma, a forensic psychiatrist who testified for the defense at trial, PCP "causes a wide variety of symptoms including having the effect of producing [a] psychosis-like condition . . . . [The user] might become . . . extremely violent without provocation." Sharma also explained that PCP can cause "flashbacks" because when ingested it "becomes attached to the fatty tissue in the brain. . . . And every now and then, sometimes a few months down the line the same PCP which is attached to the fatty tissue in the brain is released into circulation, even if the person has not taken any drugs for months he may again certainly start acting crazy because the PCP which is in the fatty tissue is once again being recirculated in the body through the blood, even though they have not taken any PCP today, they may start . . . acting strange because they have taken PCP two months, two weeks ago."

In addition to confirming these chemical properties, Pitts noted PCP can cause psychotropic effects at levels below 10 nanograms per milliliter. He also explained that "PCP is a dissociative anesthetic that produces a mental state in which the recipient is oblivious to what is happening in his or her body . . . and can cause a similar dissociative, unconscious mental state that produces random, detached, inappropriate and violent acts. Such reactions to PCP intoxication are not dose related and are variable through time." According to Pitts, certain aspects of petitioner's demeanor at the time of his arrest—excessive perspiration and his calmness—as well as his claim of memory loss are consistent with PCP intoxication.[9] PCP can also "exacerbate a person's pre-existing psychotic condition. . . . At a minimum, PCP can impair or prevent a person's ability to deliberate and premeditate." Under the governing law at the time of petitioner's offenses, a defense expert could have rendered such an opinion on the ultimate question of his state of mind. (See, e.g., *People* v. *White* (1981) 117 Cal.App.3d 270, 276-277 [172 Cal.Rptr. 612]; cf. Pen. Code, § 29.) In addition, the incidence

---

[8]For purposes of analyzing materiality, we consider both the evidence submitted in support of the petition for writ of habeas corpus and the record of the trial.

[9]With respect to petitioner's dilated pupils, the prosecution presented considerable testimony at trial that this condition was attributable to low ambient lighting at the jail. No tests were administered at the time of arrest or booking to determine whether any aspect of his demeanor specifically evidenced or negated drug intoxication.

of PCP use was increasing in 1980, and it was used to adulterate other street drugs such as methamphetamine.[10]

The positive RIA test would have been more than simply the linchpin of this defense. As independent scientific evidence of PCP in petitioner's blood at the time of the crimes, it would have enhanced the credibility of the other evidence of PCP intoxication it tended to corroborate. (See *In re Sixto* (1989) 48 Cal.3d 1247, 1264 [259 Cal.Rptr. 491, 774 P.2d 164]; *Kyles, supra,* 514 U.S. at p. 449, fn. 19 [115 S.Ct. at p. 1573].) We must thus measure not only the likely impact of the RIA itself but also the possible synergistic evidentiary effect it could have generated. (Cf. 514 U.S. at p. 436 [115 S.Ct. at pp. 1566-1567].)

Granted, the prosecution could, and undoubtedly would, have presented rebuttal evidence, including the fact the RIA test was used by the crime lab as a screening mechanism that required confirmation of any positive results. But by definition rebuttal evidence counters—it does not preclude—the defense case-in-chief. Petitioner could also have countered this rebuttal. With respect to the discrepancy between the positive RIA and the negative GC/MS results, all experts agree the two can be reconciled if the amount of PCP in the sample were below the GC/MS cutoff level but sufficient for detection by the RIA, or if the detected substance were a PCP analog for which the GC/MS was not calibrated.[11] Spiehler's testimony did not refute these possibilities. Moreover, she essentially confirmed a 98 percent correlation between RIA and GC/MS results, consistent with Pitts's statistic. Thus, notwithstanding the screening function of the RIA, the prosecution's rebuttal would only have resulted in a battle of the experts with significant points of agreement between the two sides.

Respondent does not seriously dispute the conclusion petitioner could have presented a credible diminished capacity defense based on PCP intoxication. In particular, he submits no evidence countering Pitts's declaration on the ultimate issue of petitioner's state of mind under the influence of PCP and his lack of ability to premeditate and deliberate. While emphasizing the

---

[10]For all these reasons, a claim of PCP intoxication would not be inconsistent with petitioner's testimony he had ingested methamphetamine during the 24 hours preceding the killing—assuming that after consultation with experts the defense still presented such evidence.

[11]The habeas corpus record establishes that in early 1980, crime lab personnel had been advised by the federal Drug Enforcement Agency that a "recent theft of a large quantity of 4-methyl piperidine has prompted us to anticipate its appearance in a phencyclidine homolog [or analog]." In his declaration, Pitts notes that a GC/MS test calibrated for PCP would not detect this analog because it has different mass points. In his opinion, this circumstance could explain the discrepancy in the two tests.

RIA's function as a screening device, respondent does not claim the test would have been inadmissible for this or any other reason; nor does the record support such a finding.[12] Accordingly, the assessment of its evidentiary weight must be left to the trier of fact in light of all other relevant evidence.

As the Supreme Court noted in *Kyles*, "[t]he inconclusiveness of the physical evidence does not, to be sure, prove Kyles's innocence, and the jury might have found the eyewitness testimony of [two prosecution witnesses] sufficient to convict, even though less damning to Kyles than that of [two other prosecution witnesses subject to undisclosed impeachment]. But the question is not whether the State would have had a case to go to the jury if it had disclosed the favorable evidence, but whether we can be confident that the jury's verdict would have been the same." (*Kyles, supra,* 514 U.S. at p. 453 [115 S.Ct. at p. 1575], fn. omitted.) When the verdict depends upon the resolution of conflicting evidence, that task is not for a reviewing court. (See *ibid.*)

In addition, the positive RIA would have diffused or negated some of the rebuttal the prosecution did present. Evidence of petitioner's demeanor at the time of his arrest was offered because it was inconsistent with the claim of methamphetamine use. As noted, however, Pitts found it consistent with PCP intoxication. More significantly, petitioner would have been able to challenge, with contrary scientific evidence, the testimony of Bonnie Driver that she determined PCP was not present in the blood sample. Nor could the prosecutor have argued strenuously and without contradiction, "So what independent evidence do you have of drug use in this defendant? Independent evidence of drug use this night. You have none. In fact, the only independent evidence of drug use on this night is none. Blood, no drugs in the blood. Conduct? No conduct consistent." The prosecutor used the GC/MS to make negative reference to Sharma's testimony "that long after the ingestion of . . . PCP you can determine its presence. [¶] The fact which exists in this particular case is that we don't have those—no evidence of

---

[12]The dissenting opinion suggests "it is unclear whether the test result would have been admissible" under the *Kelly/Frye* rule. (Dis. opn., *post,* at p. 903.) Although the issue would have been squarely encompassed by our order to show cause, respondent has never raised the possibility of excluding the RIA on this basis; therefore, it has been waived at least for purposes of these proceedings. In any event, the suggestion is largely beside the point to the extent it assumes the defense would not have had the sample retested for PCP and possibly obtained admissible confirmation of the positive result, e.g., by GC/MS testing with a lower cutoff. Moreover, a laboratory protocol that requires confirmation by another testing procedure does not establish the unreliability of positive RIA results; nor does it evidence the methodology is not accepted in the scientific community as reliable. By its nature, the testimony of both experts in this case demonstrated that in fact the RIA would meet the requisite standard of admissibility.

those being in the defendant's blood." He also questioned Sharma's opinion as to petitioner's diminished capacity in light of the negative results. (Cf. *Kyles, supra*, 514 U.S. at p. 444 [115 S.Ct. at p. 1571].) As in *Kyles*, "[b]ecause the State withheld evidence, its case was much stronger, and the defense case much weaker, than the full facts would have suggested." (*Id.* at p. 429 [115 S.Ct. at p. 1563].)

At this juncture, we must keep in mind petitioner does not have to establish his defense would have ultimately succeeded. (*Kyles, supra*, 514 U.S. at p. 434 [115 S.Ct. at pp. 1565-1566].) We must also factor other considerations into the materiality equation: Diminished capacity "only needs to be established sufficiently to create a reasonable doubt of the defendant's guilt when taken into consideration with all the evidence in the case." (*People* v. *Wells* (1938) 10 Cal.2d 610, 622 [76 P.2d 493].) Moreover, petitioner did not seek to avoid guilt entirely but only to negate premeditation and deliberation. At trial, his mental state was the only truly contested issue, which the jury deliberated for a day and a half, even without independent scientific evidence of intoxication.

On this record, we conclude the positive RIA finding was material within the meaning of *Brady, supra*, 373 U.S. 83. Its nondisclosure prevented petitioner from presenting a credible defense of diminished capacity, thereby denying him a fair trial. As outlined above, this "favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." (*Kyles, supra*, 514 U.S. at p. 435 [115 S.Ct. at p. 1566], fn. omitted; see *Bagley, supra*, 473 U.S. at p. 678 [105 S.Ct. at p. 3381].)

### III. DISPOSITION

Although we conclude the prosecution failed to disclose exculpatory evidence, we further determine the materiality of that evidence is limited to petitioner's capacity to premeditate and deliberate; and petitioner does not argue otherwise. He is thus entitled to relief only with respect to the first degree murder conviction, special circumstance finding, and death penalty.

The petition for writ of habeas corpus is granted. The judgment of conviction is vacated, and petitioner is remanded to the Superior Court of Orange County. Upon finality of this decision, the clerk shall remit a certified copy of this opinion to the superior court for filing, and respondent shall serve another copy thereof on the prosecuting attorney in conformity with Penal Code section 1382, subdivision (a)(2). If the People do not elect to bring petitioner to trial within 60 days after service pursuant to Penal

Code section 1382, subdivision (a)(2), the trial court shall enter judgment reflecting a conviction for second degree murder and shall sentence petitioner accordingly. (See Pen. Code, § 1484; *In re Bower* (1985) 38 Cal.3d 865, 880 [215 Cal.Rptr. 267, 700 P.2d 1269].)

Mosk, Acting C. J., Werdegar, J., and Crosby, J.,* concurred.

**KENNARD, J.,** Dissenting.—In 1980, petitioner opened fire on a group of police officers who were trying to arrest him in a crowded bar, killing one officer, seriously wounding two others, and wounding two of the bar's patrons. At trial, he asserted a defense of diminished capacity, claiming that he was under the influence of *amphetamines* when he began shooting and therefore acted without premeditation and deliberation or malice. He was convicted of capital murder and sentenced to death. He then filed a petition for writ of habeas corpus, contending that the prosecution had breached its duty to provide him with material, exculpatory evidence when it failed to disclose to his attorneys that a preliminary screening of a sample of petitioner's blood taken shortly after his arrest showed that petitioner *might* have had a different drug, *phencyclidine* (hereafter PCP), in his bloodstream. A majority of this court agrees with his contention. I do not.

In my view, the evidence at the proceedings on habeas corpus, held well over a decade after the trial when memories of the events in question had faded, is inconclusive as to whether the prosecution failed to provide the defense with the test result in question. Thus, petitioner has not met his "heavy burden" (*People* v. *Duvall* (1995) 9 Cal.4th 464, 474 [37 Cal.Rptr.2d 259, 886 P.2d 1252]) of proving that the prosecution violated his right to due process by failing to disclose the result. Far more important, however, it is inconceivable that the result of this highly unreliable preliminary screening could have altered the outcome of petitioner's trial. There was no evidence that petitioner was under the influence of PCP when he killed Officer Donald Reed, apart from his own self-serving statement that he had used the drug in the past; and he made no pretense of having used it in the days leading up to the shooting. As a result, the test result in question was not "material," and therefore did not trigger the prosecution's duty to disclose "material" exculpatory evidence.

I

The testimony at the guilt phase of petitioner's trial is accurately summarized in this court's opinion affirming petitioner's conviction on appeal:

"In June 1980 defendant was a wanted man; he had failed to appear for a jury trial and another criminal hearing, and two bench warrants were issued for his arrest. After telling his former live-in girlfriend he was not going back to jail and did not want to die in prison, defendant bought a gun and changed his name to Gordon Mink.

"Meanwhile the Garden Grove police were looking for him. At an evening prepatrol briefing on Saturday, June 7, the police department distributed a flier to all officers. The flier contained defendant's name, photograph, and description; it noted there were outstanding warrants for his arrest, described his car, and listed the address where the car was last seen.

"Shortly thereafter, Officer McInerny and his partner, Reserve Officer Henninger, found the described car at an apartment complex. They watched it from their marked patrol car for about 45 minutes before they left to handle other pressing calls. While investigating another incident about 11 o'clock later that night, the two officers again noticed defendant's car—this time at the Cripple Creek Bar.

"They called for assistance, and Garden Grove Officers Reed and Overly quickly arrived. After discussing the flier distributed earlier that evening, all four officers—all in full uniform—entered the crowded bar through two separate doors and worked their way to the center of the room.

"Defendant, who was sitting in the corner with a group of other 'motor-cycle-type people,' saw the officers enter; a nearby patron heard him [curse and] say 'the pigs are here,' as he started for the door. The officers recognized defendant and moved in his direction. At the door, Officer Reed caught up with defendant and put his hand on defendant's shoulder. Before any of the officers could draw his weapon, defendant pulled a gun and fired at least eight times. Two lethal shots hit Officer Reed; three shots gravely wounded Officer Overly; Officer Henninger was seriously wounded; a private citizen, Terezia, suffered permanent and grave injury after being shot between the eyes; and another citizen, McKinney, was shot in the leg.

"Defendant fled and hid in some bushes outside the bar. About two hours later, with numerous officers at the scene, he was found crouched in the dirt. As he was brought out of the bushes an officer called out, 'Where's the gun?' Defendant stated, 'I threw it.' His gun, hat and keys were thereafter found nearby.

" . . . . . . . . . . . . . . . . . . . . . .

"Defendant testified in his defense and presented expert witnesses who suggested he may have suffered from diminished capacity because of drug

abuse at the time of the incident. Defendant admitted he had suffered a 1970 felony conviction in Florida for 'burglary.' He detailed his extensive drug abuse history and claimed to have been under the influence of methamphet-amines on the night in question and that he remembered nothing of the events in question. In rebuttal, the People established that defendant's blood sample, taken shortly after his arrest, showed no presence of drugs and specifically, the test for methamphetamine was negative. Moreover, numer-ous officers who dealt with defendant in the four to five hours after his arrest testified that although he 'stank like a pig' he behaved normally and did not appear to be under the influence of any drug." (*People* v. *Brown* (1988) 46 Cal.3d 432, 440-441 [250 Cal.Rptr. 604, 758 P.2d 1135].)

At trial, petitioner testified that he had used PCP and many other drugs on previous occasions, but the only drug he claimed to have taken in the days leading up to the shooting was methamphetamine. Dr. Kaushal Sharma, a psychiatrist testifying for the defense, asserted that petitioner's previous use of PCP could have affected him at the time he killed Officer Reed even though he had not used the drug at or near the time of the shooting. Dr. Sharma explained that this could occur because PCP is stored in the fatty tissues of the body and may reenter the bloodstream long after the user first took the drug, producing "flashbacks."

According to Dr. Sharma, some people act in a bizarre or violent manner when under the influence of PCP, while others can take the drug without showing any outward symptoms. A PCP user's behavior during a flashback depends on "what they were acting like when they took the initial PCP": Users who initially acted in a "strange" manner would generally exhibit similar behavior during a flashback, while those whose actions were normal when initially taking the drug would act similarly during a flashback. Petitioner had told Dr. Sharma that when he took PCP he sometimes had "strange thoughts" or "acted in a strange manner" but he "had not had any bad trips on PCP."

The jury found petitioner guilty of murdering Officer Reed (Pen. Code, § 187) and found true a special circumstance allegation that he intentionally killed a peace officer engaged in the performance of his duties (*id.*, § 190.2, subd. (a)(7)). At the penalty phase, the jury imposed a sentence of death.

In his petition for writ of habeas corpus, petitioner alleged that law enforcement authorities had performed two tests on his blood sample: (1) a gas chromatography mass spectrometry (GC/MS) test, which detected no drugs and was introduced against petitioner at his trial, and (2) a radioactive immunoassay (RIA) screening of his blood, which was positive for PCP but

was never disclosed to the defense. Petitioner contended that by failing to disclose the latter result, the prosecution violated his right to due process of law, which imposes on the prosecution an "affirmative duty to disclose evidence favorable to a defendant," even in the absence of a specific request. (*Kyles* v. *Whitley* (1995) 514 U.S. 419, 432 [115 S.Ct. 1555, 1565, 131 L.Ed.2d 490]; see also *United States* v. *Bagley* (1985) 473 U.S. 667, 683 [105 S.Ct. 3375, 3384, 87 L.Ed.2d 481]; *Brady* v. *Maryland* (1963) 373 U.S. 83, 87 [83 S.Ct. 1194, 1196-1197, 10 L.Ed.2d 215].) We issued an order to show cause and an order of reference, directing the referee to determine whether the prosecution disclosed the RIA test result to the defense, and whether the GC/MS and RIA test results could be reconciled.

The referee (Judge Daniel J. Didier of the Orange County Superior Court) concluded that the prosecution had disclosed the RIA test result to the defense. He also found that the difference in the GC/MS and RIA results was attributable to the unreliability of the RIA test, which often reported the presence of PCP in blood samples in which no PCP was present.

The majority rejects each of these findings. It concludes that the prosecution failed to provide the RIA test result to the defense, and that the inconsistent test results, while possibly attributable to the limitations of the RIA test, may also have been attributable to other factors that would be consistent with the hypothesis that petitioner was under the influence of PCP when he killed Officer Reed. Finally, it concludes that the undisclosed test result was "material"; that is, the result "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict" (*Kyles* v. *Whitley, supra*, 514 U.S. at p. 435 [115 S.Ct. at p. 1566], fn. omitted), and that therefore petitioner's conviction and death sentence must be vacated.

The majority is wrong in rejecting the referee's finding that the prosecution did disclose the RIA test result to the defense. Moreover, although I agree with the majority that there are several possible explanations for the inconsistency between the RIA and GC/MS test results, I conclude that the RIA test was not "material," because it could not possibly have affected the outcome of petitioner's trial.

## II

The first question we asked the referee to determine was this: "Did the prosecution disclose the positive PCP finding to petitioner, his investigator, or his counsel before or during trial?" The referee found it "very difficult" to give a yes or no answer, because more than a decade had passed since the

trial. There was strong circumstantial evidence that the prosecution had disclosed the test result to the defense, but there was equally strong circumstantial evidence that the result had not been disclosed. After weighing the conflicting evidence, the referee found that the prosecution had disclosed the test's positive PCP result to the defense.

It is undisputed that the Orange County Sheriff-Coroner Department, Forensic Science Services (hereafter the crime lab) performed GC/MS and RIA tests of petitioner's blood sample, and that the former test was negative for PCP and several other controlled substances while the latter test was positive for PCP. The crime lab prepared a detailed "worksheet" that recorded the results of both tests; the lab's "result sheet," however, indicated only that PCP was "not detected" in petitioner's blood sample. Although no witness expressly explained why the result sheet did not mention the positive RIA test, it appears to have been omitted because crime lab scientists believed that negative RIA test results were reliable but positive results were not, and they used the RIA test as a preliminary screening mechanism to determine whether they needed to perform the more accurate GC/MS test. In 1980, when the testing occurred, the crime lab's policy in criminal cases was to send copies of the *result* sheet to the prosecutor and defense counsel, but to send a copy of the *worksheet* to either attorney only upon request. Disclosure of the worksheet required the approval of a supervising criminalist.

The record before this court contains no evidence that the crime lab furnished the Orange County District Attorney's office with a copy of the worksheet, which showed the positive RIA test, nor does it indicate that anyone in that office ever learned of the result of the RIA test. Prosecutors, however, have a duty to disclose not only material, exculpatory evidence actually known by the attorney prosecuting the case, but also evidence known to the investigating agencies acting on the prosecutor's behalf. (*Kyles* v. *Whitley, supra*, 514 U.S. at p. 440 [115 S.Ct. at pp. 1568-1569].) Thus, the prosecution in this case was obligated to disclose any material, exculpatory evidence possessed by the crime lab, a county agency that was analyzing the blood tests for the district attorney's office. The crucial inquiry therefore is whether the crime lab ever disclosed the RIA test result to petitioner or his attorneys.

Deputy Public Defender Michael Beecher (now an Orange County Municipal Court Judge) initially represented petitioner following his arrest on June 8, 1980. In November 1980, petitioner elected to represent himself, and he handled the pretrial proceedings the year thereafter, while Beecher provided assistance as "backup" or "advisory" counsel. In November 1981, the

trial court appointed private attorney Daye Shinn to represent petitioner, and Shinn continued to represent petitioner throughout the balance of the proceedings in the trial court. There is no evidence that the crime lab ever provided a copy of the worksheet to petitioner, Defense Attorney Shinn, or Shinn's investigator, or that anyone ever informed any of them of the worksheet's existence. Whether the crime lab furnished the worksheet to Attorney Beecher, however, was a hotly contested issue at the reference hearing.

Deputy Public Defender Beecher's file notes show that on October 16, 1980, he telephoned Mary Graves, a supervising criminalist at the crime lab, and asked for reports on petitioner's blood testing, and that Graves told him she would send a report. But his file, which was retained by the public defender's office after it ceased to represent petitioner, contains only the result sheet, not the worksheet on which the PCP-positive RIA test result was recorded.[1] Beecher testified at the reference hearing that he did not recall receiving the worksheet, and that his notes made no mention of the worksheet. Had he seen it, he said, he would have regarded the worksheet's information as "very significant," would have noted it in his file, and would have consulted with a PCP expert.

Because the reference hearing was held 16 years after the crime lab's testing of petitioner's blood sample, it was not surprising that no one at the crime lab had any recollection of sending the worksheet of petitioner's blood test to Defense Attorney Beecher. *But the bottom of the worksheet carried this notation*: "Bercher [*sic*], Pub. Def. B-100 10-16-80." Frank Fitzpatrick, the chief criminalist in charge of managing the crime lab's clerical staff in October 1980, testified that this notation meant that on October 16, 1980, the lab sent copies of *both* the result sheet, which contained only the lab's ultimate finding that PCP was "not detected," *and* the more detailed worksheet, which noted that the preliminary RIA test was positive for PCP, to Attorney Beecher at his office in room B-100 of the Orange County Courthouse.

The referee found the notation on the worksheet, mentioned above, to be persuasive evidence that the prosecution had sent a copy of the worksheet to Beecher, but also found Beecher's testimony persuasive evidence to the contrary. It resolved this conflict in favor of the prosecution.

In the view of the majority, however, the referee did not find that the prosecution had provided the worksheet to the defense. The majority states

---

[1]Witnesses testified that Beecher kept meticulous records, making it unlikely that he would have misplaced the test result outside of the file.

that the referee's findings "do not accurately respond to the specific question posed in our reference order—did *the prosecution* disclose the RIA result *to petitioner or anyone acting on his behalf?*" (Maj. opn., *ante*, at p. ·878, original italics.) On the contrary, the referee's finding is explicit: "The evidence preponderates that . . . the positive RIA finding, was . . . disclosed and duly forwarded to defense counsel before trial, as requested." The only aspect of this finding that could conceivably be viewed as unresponsive is its failure to specify *who* had disclosed to the defense the worksheet indicating the positive RIA finding. The majority apparently considers this a fatal flaw, pointing out that the prosecuting attorney "had no knowledge of the worksheet and thus could not have disclosed it." (*Ibid.*) Thus, the majority concludes, it need not determine whether the *crime lab* had furnished the test result to the defense, because the "prosecution"—by which the majority presumably means the district attorney's office—did not do so. (*Ibid.*)

The majority is wrong. As the majority itself acknowledges, courts have consistently " 'decline[d] "to draw a distinction between different agencies under the same government, focusing instead upon the 'prosecution team' which includes both investigative and prosecutorial personnel." ' " (Maj. opn., *ante*, at p. 879, quoting *United States* v. *Auten* (5th Cir. 1980) 632 F.2d 478, 481.) Here, the Orange County District Attorney's office and the Orange County Sheriff-Coroner Department's crime lab, the agencies involved here, worked on the same side, that of the prosecution. In short, they were the prosecution's team. Therefore, so long as disclosure of material evidence was made to the defense by any part of that team, whether by a member of the district attorney's office or a member of the crime lab, the prosecution had done its duty.

The majority apparently also concludes that the referee found that the defense never received the worksheet. (Maj. opn., *ante*, at p. 878.) Although the referee's report on this issue is somewhat unclear, in my view he made no such finding. Rather, the referee found that there was "credible" circumstantial evidence that the worksheet had not been disclosed to the defense, but he also found credible circumstantial evidence of such disclosure. The referee resolved the conflict adversely to petitioner, who had the burden of proof.[2]

---

[2]This is what the referee said on this issue: "Question one ['Did the prosecution disclose the Positive PCP finding to petitioner, his investigator, or his counsel before or during trial?'] is very difficult to answer yes or no. A reasonable inference can be drawn, from both the testimony, and the documentary evidence, that copies of both the final results (ex. 1) and the worksheet (ex. 2) were duly forwarded to Public Defender Beecher, as requested. Procedures for obtaining a worksheet were for a requesting attorney to talk to a supervisor, which

The referee's resolution was proper. As this court has explained: "Because a petition for a writ of habeas corpus seeks to collaterally attack a presumptively final criminal judgment, the petitioner bears a heavy burden initially to *plead* sufficient grounds for relief, and then later to *prove* them. 'For purposes of collateral attack, all presumptions favor the truth, accuracy, and fairness of the conviction and the sentence; *defendant* thus must undertake the burden of overturning them. Society's interest in the finality of criminal proceedings so demands, and due process is not thereby offended.' " (*People* v. *Duvall, supra,* 9 Cal.4th 464, 474, original italics.)

This court gives great weight to a referee's findings of fact when they are supported by substantial evidence, because the referee had the opportunity to observe the demeanor of witnesses and their manner of testifying. (*In re Marquez* (1992) 1 Cal.4th 584, 603 [3 Cal.Rptr.2d 727, 822 P.2d 435].) Curiously, in reaching its conclusions, the majority makes no mention of this well-established standard of review. Here, the evidence at the reference hearing was inconclusive. According the referee's findings the weight they are due, I conclude that petitioner did not meet his heavy burden of establishing that the prosecution failed to disclose to the defense the RIA test result indicating the presence of PCP in petitioner's blood sample.

### III

The second question we asked the referee to resolve was this: "Did the positive PCP finding from the RIA test indicate that there was PCP or a PCP analog in petitioner's blood at the time of the crimes? If so, did the subsequent negative PCP finding from the GC/MS test establish that there was no PCP or PCP analog in petitioner's blood at the time of the crimes? How can the results of the two tests be reconciled?"

The referee found that (1) the RIA test's positive PCP finding did not indicate that there was PCP or a PCP analog in petitioner's blood; (2) the

---

Beecher did. Notations were to be placed on the documents as to destination, which was done here. The evidence is also credible that Beecher, as well as his successor counsel, were unaware of the existence of the worksheet, thus a reasonable inference that it was not received. The evidence is credible that the District Attorney's office was not aware of the worksheet, or of the positive RIA finding, and that if any exculpatory evidence had been available, either by the RIA worksheet, or otherwise, that it would have, as a matter of course, been released to defense counsel. There was no evidence that exhibit 2, or any other documentation, was concealed or withheld from either the district attorney or defense attorneys, by the crime lab, or that any police agency or the District Attorney withheld or concealed information. While testimony as to all witnesses on this issue is deemed credible, the evidence preponderates that the documentation, including the positive RIA finding, was freely available, disclosed and duly forwarded to defense counsel before trial, as requested. The answer to question one is yes."

subsequent negative finding by the GC/MS test established that there was no PCP or PCP analog in petitioner's blood; and (3) the conflicting results of the two tests could be "reconciled" by treating the RIA test result as incorrect.

The referee's finding that the GC/MS test was right and the RIA test was wrong is, according to the majority, but one explanation for the discrepancy between the two tests. There are other explanations for the discrepancy, the majority notes, that leave open the possibility that the RIA test result was correct. I agree with the majority that it is *possible*, albeit unlikely, that the RIA test result was accurate.

The most persuasive evidence regarding the reliability of the RIA test was offered by Dr. Vina Spiehler, a noted forensic toxicologist whose expert testimony was credited by the referee. Dr. Spiehler is a former president of the Society of Forensic Toxicologists and the California Association of Toxicologists, a former editor of the Toxicology Division Newsletter of the American Academy of Forensic Sciences, and the author of numerous published studies analyzing the reliability of RIA testing for PCP and other illegal drugs. She was also quite familiar with the procedures at the crime lab where petitioner's blood sample was tested, having worked there from 1981 (the year after the sample was tested) to 1986.

Dr. Spiehler explained that in 1980 the RIA test was used as a preliminary screen because its *negative* findings were considered reliable, but its *positive* findings were not. In other words, if the RIA test found *no* PCP in a blood sample, then the chances were high that the finding was accurate. But if, as in this case, the RIA test indicated that there *was* PCP in a suspect's blood, the result was not reliable, thus necessitating further tests to determine whether PCP was actually present.

Based on studies she and other scientists had performed on the accuracy of the RIA test, Dr. Spiehler concluded that if an RIA test of the type used in 1980 produced a positive result for PCP, there was only a 37 percent probability that the tested blood actually contained PCP. Thus, Dr. Spiehler stated, petitioner's positive RIA test result meant only that there was about one chance in three that petitioner's blood actually contained PCP.

At the reference hearing, petitioner argued there were two possible explanations for the conflicting RIA and GC/MS test results that would be consistent with his claim that he had PCP or a PCP analog in his bloodstream at the time of the shooting. Although the evidence did not conclusively exclude either of these possibilities, neither of them was very likely, as I shall explain.

Petitioner's expert, Dr. Ferris Pitts, pointed out that the crime lab had used the GC/MS test to test petitioner's blood sample only for PCP, not for any PCP analog. A PCP analog, Dr. Pitts explained, is a substance similar but not identical to PCP, which produces the same psychotropic effects as PCP. Such an analog, he testified, might register a positive result on the RIA test, but a negative result on the GC/MS test, which is more precise.[3]

Dr. Spiehler, the prosecution's expert, acknowledged that the GC/MS test might not detect a PCP analog. But she added that most such analogs are chemically so similar to PCP that the GC/MS test would indicate their presence, even if it did not register a positive result. After examining petitioner's GC/MS test, Dr. Spiehler found no indication that such analogs were present in petitioner's blood sample. Her testimony was corroborated by Dr. Robert Cravey, a former chief forensic toxicologist for the Orange County Sheriff-Coroner's Department. Petitioner offered no evidence that any PCP analog whose chemical structure was so different from that of PCP that it would not show up on the GC/MS test was in use in Orange County during 1980.[4]

Petitioner also asserts that the RIA test can detect smaller concentrations of PCP in a blood sample than the GC/MS test. Thus, he argues, he may have had a quantity of PCP in his blood sample great enough to have affected his thinking and to be detected by the RIA test, but too minute to be detected by the GC/MS test.

The GC/MS test that was run on petitioner's blood sample had the capability of detecting the presence of as little as 25 nanograms per milliliter of PCP in the blood and might have been able to detect as little as 10 nanograms per milliliter. Because certain printouts relating to the GC/MS test run on petitioner's blood have been lost or destroyed, it is no longer possible to determine whether that test could have detected quantities between 10 and 25 nanograms per milliliter.

On the other hand, the RIA test could, according to the manufacturer, detect 50 to 70 nanograms of PCP per milliliter of blood and thus could not

---

[3]The GC/MS test for PCP examines only three "channels" on the scale for evidence of the drug. If PCP is present, it will appear on all three channels. Evidence of other drugs chemically related to PCP is likely to appear on one of the three channels, but not all three.

[4]Petitioner's expert, Dr. Ferris Pitts, testified that a PCP analog, "4-methyl PCP," is "found on the street and used by individuals." He said that evidence of this analog would appear on a GC/MS test for PCP, because 4-methyl PCP, like PCP itself, would have a "mass point" at about 200 on the scale used to measure the results of the GC/MS test. On direct examination, he claimed that petitioner's GC/MS test appeared to show a mass point at about 200. On cross-examination, however, he admitted that he saw only "a little bit of" a mass point, and that he "would have to do a lot more work to be sure what it was." The prosecution's experts, Dr. Spiehler and Dr. Cravey, testified that there was no such mass point in the results of petitioner's GC/MS test.

detect concentrations as small as those that could be found using the GC/MS test. But petitioner's expert, Dr. Pitts, gave uncontradicted testimony that at the time petitioner's blood sample was tested almost all laboratories were able to refine the RIA test so that it could measure smaller quantities of PCP. Dr. Pitts said that in 1980 the RIA test could "regularly" detect as little as 10 nanograms of PCP per milliliter of blood and on occasion even as little as 1 or 2 nanograms per milliliter. It is therefore possible that petitioner had a very small quantity of PCP in his blood when tested, and that this tiny quantity was detected by the RIA test but not by the GC/MS test.

It is not at all clear, however, that concentrations of PCP too small to be detected by the GC/MS test can nonetheless have a pharmacological effect. The prosecution's expert, Dr. Spiehler, testified that the American Association of Clinical Chemistry has found that the drug has such an effect only in concentrations greater than 75 nanograms per milliliter of blood. She added that the most "liberal" scientific organizations have taken the position that such effects can be found in concentrations as small as 7 nanograms per milliliter. As I noted earlier, Dr. Pitts, the defense expert, testified that even smaller quantities of PCP can cause a pharmacological effect. The referee, however, found Dr. Spiehler's testimony to be more credible than that of Dr. Pitts.

In summary, it is *possible* that petitioner was under the influence of a PCP analog that was detectable by the RIA test, but which was chemically so different from PCP that it would not appear on the GC/MS test. But because there is no evidence that any such analogs were available in Orange County in 1980, the likelihood of this possibility is slight. Similarly, it is *possible* that the RIA test that was conducted here may have been capable of detecting concentrations of PCP in petitioner's bloodstream smaller than those measured by the GC/MS test, and it is *possible* that those small concentrations could have had a pharmacological effect on petitioner at the time of the shooting. But the likelihood that petitioner's blood sample had a quantity of PCP too small to be detectable by the GC/MS test, yet large enough to significantly affect his behavior, is not great. Far more likely is the referee's conclusion that the RIA test's positive result for PCP was simply an inaccurate "false positive," which Dr. Spiehler found to be true of most PCP-positive RIA test results. These matters are significant to the resolution of the final question this court must address: whether any failure by the prosecution to disclose the result of the RIA test was material.

IV

A prosecutor's failure to disclose exculpatory evidence to a criminal defendant before trial does not by itself require that the defendant's conviction be overturned. Reversal is required only if the undisclosed exculpatory

evidence was "material." (*Kyles* v. *Whitley, supra,* 514 U.S. at p. 434 [115 S.Ct. at p. 1566].) Evidence is "material" if there is a "reasonable probability" that the outcome of the trial would have been different had the evidence been disclosed, which occurs when the undisclosed evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." (*Id.* at pp. 434-435 [115 S.Ct. at p. 1565-1566], fn. omitted.) If the undisclosed evidence is "material," the defendant's conviction must be vacated without a separate harmless error review, because the prejudice determination is subsumed within the definition of the term "material." (*Id.* at pp. 435-436 [115 S.Ct. at pp. 1566-1567].)

The majority concludes that the prosecution's alleged failure to disclose the result of the RIA test was "material" within this definition, requiring that his murder conviction be vacated. I disagree.

If the defense had attempted to introduce evidence of the positive RIA test result, it is unclear whether the test result would have been admissible. To justify the test result's admission, petitioner would have to satisfy the long-established requirements for the admission of scientific tests commonly known as the *Kelly/Frye* rule. (*People* v. *Kelly* (1976) 17 Cal.3d 24 [130 Cal.Rptr. 144, 549 P.2d 1240]; *Frye* v. *United States* (D.C. Cir. 1923) 293 F. 1013 [54 App.D.C. 46, 34 A.L.R. 145].) In *People* v. *Diaz* (1992) 3 Cal.4th 495, 526 [11 Cal.Rptr.2d 353, 834 P.2d 1171], this court summarized this rule as follows: "Under the *Kelly/Frye* rule, evidence based on a new scientific method of proof must satisfy three requirements before it may be admitted. First, the party offering the evidence must show that the technique is ' "sufficiently established to have gained general acceptance in the particular field in which it belongs." ' [Citations.] Second, the proponent of the evidence must establish that 'the witness furnishing such testimony' is 'properly qualified as an expert to give [such] an opinion . . . .' [Citation.] Third, the proponent must demonstrate that 'correct scientific procedures were used in the particular case.' [Citations.]"

It is uncertain whether petitioner could have shown that a PCP-positive RIA test result, as occurred here, was generally accepted by the scientific community as an accurate indicator of the presence of PCP. Although several published decisions have upheld the admission of the results of RIA analysis of human hair as evidence of cocaine use (see *State Emp. Sec. Dept.* v. *Holmes* (1996) 112 Nev. 275 [914 P.2d 611]; *Matter of Adoption of Baby Boy L.* (N.Y.Fam.Ct. 1993) 157 Misc.2d 353 [596 N.Y.S.2d 997]), to my knowledge, no published decision has ever held that the results of RIA blood tests (either positive or negative) for any drug are sufficiently accepted by the scientific community to be admissible in court. According to the prosecution's expert, Dr. Spiehler, the Food and Drug Administration requires all

manufacturers of RIA testing kits to state that a positive finding must be confirmed by a GC/MS test before being reported, and this requirement is echoed in the guidelines of the American Academy of Forensic Scientists and the Society of Forensic Toxicologists. Thus, the scientific community apparently does not view an unconfirmed positive RIA test as a reliable indicator of drug intoxication.[5]

Assuming for the sake of argument that petitioner could have successfully introduced the RIA test result into evidence, he would have had to overcome an even more formidable hurdle: persuading the jury that (1) he was under the influence of PCP when he killed Officer Reed, and (2) that as a result of the PCP intoxication he lacked premeditation and deliberation or malice. In 1982, when petitioner's trial took place, the task of convincing a jury of the merits of a diminished capacity claim was difficult in the best of circumstances; as one court explained, "juries take a notoriously dim view of the diminished capacity concept although appellate courts seem to love to explore it in the most erudite manner . . . ." (*People* v. *Huffman* (1977) 71 Cal.App.3d 63, 76 [139 Cal.Rptr. 264].)[6] Here, there was overwhelming evidence showing either that PCP was *not* in petitioner's bloodstream when he killed Officer Reed, or that if it was, it did not significantly affect petitioner's mental state at the time of the killing. Given this evidence, it is highly unlikely that petitioner would have been successful in persuading the jury that he suffered from diminished capacity caused by PCP intoxication.

Petitioner offered no evidence at trial that his behavior before and after he killed Officer Reed was bizarre or irrational; to the contrary, his conduct

---

[5]I disagree with the majority's assertion, which is not supported by any citation of authority, that the Attorney General "waived" the argument that the RIA test results would have been inadmissible. (Maj. opn., *ante*, at p. 890, fn. 12.) Petitioner has the burden of demonstrating a reasonable probability that disclosure of the RIA test would have altered the outcome of his trial, and the Attorney General has properly asserted that petitioner did not satisfy that requirement. Contrary to the majority's assertion, the Attorney General's failure to mention the *Kelly/Frye* test in explaining why that burden has not been met does not prevent this court from relying on the test as a basis for denying the petition for habeas corpus.

The majority also contends that whether the RIA test would have been admissible is "largely beside the point" because the defense could have had the blood sample retested for PCP and "possibly" obtained admissible confirmation of the positive result with a GC/MS test. (Maj. opn., *ante*, at p. 890, fn. 12.) There is no evidence whatever in the record to support the majority's speculation that such a test would have verified the RIA test result. Moreover, the record reflects that the prosecution provided the defense with a portion of the blood sample for testing *before trial*; thus, the prosecution's alleged failure to disclose the RIA test result did not deny petitioner the opportunity to conduct such a test.

[6]In June 1982, two weeks after petitioner's trial, California voters overwhelmingly approved Proposition 8, a voter initiative that, among other things, abolished the diminished capacity defense. (See *People* v. *Saille* (1991) 54 Cal.3d 1103, 1112 [2 Cal.Rptr.2d 364, 820 P.2d 588].)

appeared goal-directed and rational. Petitioner knew there was a warrant for his arrest; he had changed his name, bought a gun, and told his girlfriend that he did not want to return to prison. When police officers entered the bar on the night of the killing, petitioner said, "Fuck, the pigs are here," and tried to leave. When one of the officers attempted to detain him, petitioner opened fire, killing one officer and wounding two others. He had sufficient presence of mind to flee, to hide in the bushes, and to dispose of the murder weapon and a hat that might have helped to identify him. When arrested two hours later, he behaved normally and gave no indication that he was under the influence of any drug. The pupils of his eyes were dilated, which is a symptom of methamphetamine use. PCP, by contrast, causes nystagmus (rapidly bouncing pupils) and causes the pupils to contract. (*People* v. *Bonillas* (1989) 48 Cal.3d 757, 782 [257 Cal.Rptr. 895, 771 P.2d 844]; *People* v. *Dunkel* (1977) 71 Cal.App.3d 928, 932-933 [139 Cal.Rptr. 685].) There is no evidence that petitioner displayed these PCP symptoms. Moreover, petitioner testified that he used methamphetamine, not PCP, on the day he killed Officer Reed.

The majority speculates that petitioner may have had a PCP flashback when he killed Officer Reed. It points out that at petitioner's trial a forensic psychiatrist, Dr. Kaushal Sharma, testified that PCP becomes attached to the fatty tissue in the user's brain and may be released into the user's system long after it was originally ingested, causing such flashbacks to occur. Thus, the majority asserts, petitioner's use of PCP *long before* he killed Officer Reed could have caused him to be under the influence of PCP at the time of the killing. But Dr. Sharma testified that persons having such flashbacks ordinarily behave in the same manner in which they acted when they initially took the drug. Because petitioner admitted to Dr. Sharma that he "had not had any bad trips on PCP," it is unlikely that a PCP flashback would have caused his violent behavior at the time of the shooting. Furthermore, there is no evidence that petitioner's behavior before the officers entered the Cripple Creek Bar was unusual or violent, and the possibility that he conveniently had a flashback at the precise moment they entered the bar is farfetched.

In short, the most reliable scientific evidence (the GC/MS test) showed that petitioner was not under the influence of PCP when he shot and killed Officer Reed, his behavior at the time of the killing was not suggestive of PCP intoxication, and in his own testimony he made no claim of using PCP in the hours or days immediately preceding the shooting. Given this evidence, the RIA test result showing that PCP was possibly present in petitioner's blood sample could not have altered the outcome of his trial. It therefore did not fall within the scope of the prosecution's duty to disclose material evidence.

## CONCLUSION

For the reasons set forth above, I would deny the petition for writ of habeas corpus.

Baxter, J., and Chin, J., concurred.

Repondent's petition for a rehearing was denied May 20, 1998. George, C. J., did not participate therein. Kennard, J., Baxter, J., and Chin, J., were of the opinion that the petition should be granted.