*337 LIU, J., Concurring.
I join the court’s opinion. The prosecution’s withholding of favorable, material evidence that would have been provided by a confidential informant, Gale Kesselman, violated petitioner’s right to due process under Brady v. Maryland (1963) 373 U.S. 83, 87 [10 L.Ed.2d 215, 83 S.Ct. 1194] and entitles him to relief. I write separately to highlight three additional points in favor of the court’s holding.
The first concerns the significance of Santa Clara County Superior Court Judge Read Ambler’s pretrial ruling that Kesselman was not a material witness. The court rejects the Attorney General’s argument that “any obligation the prosecution may have had to disclose to the defense either Gale Kesselman’s identity or the information she had provided was excused” by that ruling. (Maj. opn., ante, at p. 336.) As the court explains, Judge Ambler’s pretrial ruling “was limited to whether Kesselman was a material witness on the issue of petitioner’s guilt of the Guerrero brothers’ murders. Judge Ambler never addressed whether Kesselman was a material witness on the issue of penalty for those murders. As we have stated, the prosecution’s disclosure obligations extend to evidence that is material on either guilt or penalty.” (Ibid.)
Equally significant, in my view, is the referee’s finding that prosecution investigator Sandra Williams lied and induced Gale Kesselman to lie at the September 1985 ex parte hearing that led to Judge Ambler’s pretrial ruling. After hearing Kesselman and Williams testify at the reference hearing, the referee found that Kesselman was a credible witness and that Williams was not. The referee further found that Williams told Kesselman “to withhold information . . . and not to testify to all relevant facts” at the September 1985 hearing. Specifically, the referee found that Kesselman “lied” when she denied at the hearing that Angarita had given her “any information that he knew [the murders were] contract killing [s]” and that Kesselman did so because “Williams had convinced her that... all she knew was speculation” despite the fact that “Angarita had told [Kesselman] in so many words that this was a contract killing.” The referee further found that at the September 1985 hearing, “Williams did not testify truthfully when she testified . . . that [Kesselman] had no information about the murder case” and when Williams answered “no” to the question whether Kesselman “indicate[d] in any way that Jose Angarita said that he had heard from any source” that the murders were revenge killings. Therefore, Judge Ambler’s determination that Kesselman was not a material witness was, according to the referee’s findings, unmistakably tainted by the prosecution’s misconduct. That misconduct concealed the very information that would have led Judge Ambler to conclude that Kesselman was a material witness at least for the penalty phase of the trial.
The second point concerns the referee’s finding, noted by the court, that had the defense gained access to Kesselman, it “would have” uncovered *338 another key witness, someone who had worked in Angarita’s operation and who testified at the reference hearing on condition of anonymity using the name “Joseph.” Joseph worked for Angarita around the time of the murders and knew a great deal about Angarita’s operation. Kesselman knew Joseph, and she further knew that Joseph was in federal prison for sale of cocaine at the time of petitioner’s trial because her cooperation with the Drug Enforcement Agency had helped to put him there. A police report in defense counsel’s possession had identified Joseph as an associate of Angarita, but had incorrectly and misleadingly reported that Joseph, had “bailed and split” and that his whereabouts were unknown.
The referee found that Joseph was a credible witness. Contrary to the Attorney General’s argument, any minor factual discrepancies in his testimony about events that occurred 23 years earlier do not undermine that finding, for we assume the referee considered those discrepancies, along with Joseph’s demeanor, while testifying, before concluding he was a credible witness. (In re Price (2011) 51 Cal.4th 547, 559 [121 Cal.Rptr.3d 572, 247 P.3d 929] [“Because the referee observes the demeanor of testifying witnesses, and thus has an advantage in assessing their credibility, this court ordinarily gives great weight to the referee’s findings on factual questions.”].) From Joseph, the defense would have learned about Angarita’s drug operation and his ruthless methods of enforcement. Critically, the defense also would have learned about Angarita’s statements to Joseph that the murder victims, the Guerrero brothers, stole two kilos of cocaine from Angarita and that he wanted them killed and intended to have them killed. Joseph also would have corroborated Kesselman’s account of a meeting between petitioner and Angarita the night before the murders. Joseph confirmed at the reference hearing that if he had been contacted in prison, he would have been willing to provide this information to petitioner’s attorney.
Most significantly, the referee found that Joseph would have provided evidence of a conversation between him and petitioner before the Guerrero brothers were murdered. In that conversation, petitioner recounted that Angarita had ordered petitioner to do a “job” and that if he did not do it, Angarita would kill members of petitioner’s family, starting with his mother. According to Joseph, petitioner’s eyes were filled with tears as he revealed his predicament, and Joseph told him not to do it. This was the last Joseph saw of petitioner. This testimony would have strongly corroborated petitioner’s penalty phase duress defense.
The Attorney General is not correct that the rule against hearsay evidence bars us from considering Joseph’s testimony. First, Joseph’s testimony at the reference hearing was admissible for the nonhearsay purpose of determining what evidence the defense would have uncovered but for the prosecution’s *339 misconduct, a determination directly responsive to the sixth question this court put to the referee: “Is it likely that disclosure of the confidential informant’s identity to the defense would have led to evidence not otherwise known or available to the defense at the time of trial that would have supported petitioner’s claim to have acted under death threats from the Colombian Mafia?” Second, much of Joseph’s testimony would have been admissible at the penalty phase of petitioner’s trial had Joseph been called as a witness. Joseph’s testimony recounted statements by Angarita that were against Angarita’s penal interest and hence admissible under Evidence Code section 1230 as statements that “subjected [the declarant] to the risk of civil or criminal liability.” In addition, Joseph’s testimony of his conversation with petitioner would have been admissible under Evidence Code section 1250 as evidence of petitioner’s then present state of mind—in particular, that petitioner was under duress at the time he committed the murders. (See 6 Wigmore, Evidence (Chadboum rev. 1976) § 1714, p. 90 [“the judicial doctrine has been that there is a fair necessity, for lack of other better evidence, for resorting to a person’s own contemporary statements of his mental or physical condition”].) Further, there is no evidence that petitioner’s statements to Joseph were “made under circumstances such as to indicate [their] lack of trustworthiness.” (Evid. Code, § 1252.)
As the Attorney General notes, petitioner would have known about his conversation with Joseph. But defense counsel—unaware of Joseph’s whereabouts and unable to otherwise corroborate petitioner’s statement to the police that the murder was for hire and committed under duress—reasonably concluded that the duress defense was not worth pursuing. Without corroboration, the duress defense might have done more harm than good; the jury might have viewed it as a deceptive attempt by petitioner to evade responsibility for the murders, as the prosecution argued at trial. (Maj. opn., ante, at p. 335.) The referee’s finding that defense counsel would have prepared a credible duress defense had they gained access to Kesselman and Joseph is supported by substantial evidence in the record.
Even if the prosecution did not know what testimony Joseph would have given at trial, we may still consider that potential testimony in determining the materiality of the prosecution’s failure to disclose evidence supplied by Kesselman. As the United States Supreme Court said in United States v. Bagley (1985) 473 U.S. 667, 682 [87 L.Ed.2d 481, 105 S.Ct. 3375], evidence withheld by the prosecution “is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.” Importantly, the high court made clear that “the reviewing court may consider directly any adverse effect that the prosecutor’s failure to respond might have had on the preparation or *340 presentation of the defendant’s case.” (Id. at p. 683.) We have not previously considered the outer limits of this aspect of Brady's liability, and we need not do so here given the specificity of the referee’s findings. Here, the referee found the prosecution was aware of, and made a conscious attempt to suppress, the fact that Kesselman had substantial information about Jose Angarita and his drug trafficking that corroborated petitioner’s claim of a murder for hire. One of the major adverse effects of the prosecution’s improper efforts to suppress the Kesselman evidence and to prevent the defense from contacting Kesselman was that the defense failed to uncover the critical evidence corroborating petitioner’s duress defense that Joseph’s testimony would have provided.
Third, the referee found that Williams played an active role in discouraging defense counsel from pursuing a duress defense. Defense investigator Alayne Bolster had conducted a pretrial interview of district attorney investigator Ron McCurdy in February 1986. During that interview, McCurdy disclosed that Karlos Tijiboy, whom petitioner had identified as the person who ordered him to kill the Guerreros, was involved in Angarita’s drug-trafficking operation. McCurdy also described Angarita’s connections to the victims and to the wife of one of the victims. He told Bolster that Angarita had three or four drug lieutenants in his drug business, including Joseph. McCurdy also told Bolster that Williams might know more.
When Bolster followed up with Williams, Williams told Bolster that the information relayed by McCurdy was incorrect. Williams said that Tijiboy had nothing to do with drugs or with Angarita, and that she could find no connection between Angarita and the drug trade—even though Williams was clearly aware of such a connection, according to the referee’s findings. She also told Bolster that there was no drug-related connection between Angarita and the victims or between Angarita and petitioner—even though the referee repeatedly found Williams’s testimony that she saw no connection between Angarita and the murders not to be credible.
According to the referee, “the prosecution through Sandra Williams affirmatively told the defense that the information the defense had about any putative connection between the killings and a drug-related contract hit was not correct.” As a result, defense counsel believed and relied on Williams’s representations that further investigation of a drug connection to the murders would be a dead end. Thus, the prosecution did not simply suppress favorable, material evidence. It also affirmatively dissuaded the defense from pursuing a line of inquiry that would have uncovered such evidence. (See United States v. Bagley, supra, 473 U.S. at p. 682.)
*341 For purposes of assessing materiality, we must consider collectively all undisclosed evidence in order to assess its cumulative effect. (In re Brown (1998) 17 Cal.4th 873, 887 [72 Cal.Rptr.2d 698, 952 P.2d 715].) Accordingly, for the reasons above, and for the reasons stated in the court’s opinion, I agree that petitioner is entitled to relief.
Cantil-Sakauye, C. J., Werdegar, J., and Corrigan, J., concurred.