Filed 3/30/16  P. v. Lopez CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>CARLOS LOPEZ,<br><br>    Defendant and Appellant. | D069279<br><br><br><br>(Super. Ct. No. FSB 804305) |

APPEAL from a judgment of the Superior Court of San Bernardino, Harold T. Wilson, Jr., Judge.  Reversed and remanded with directions.

Mark L. Christiansen, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal and Collette C. Cavalier, Deputy Attorneys General, for Plaintiff and Respondent.

After the first trial resulted in a hung jury, a jury convicted Carlos Lopez of first degree murder (Pen. Code,[1] § 187, subd. (a); count 1) and attempted murder (§§ 664, 187, subd. (a); count 2). The jury also found true the allegations that Lopez personally used a firearm (§ 12022.53, subd. (b)), personally and intentionally discharged a firearm causing great bodily injury and death (§12022.53, subds. (c), (d)), and committed the offenses for the benefit of, at the direction of, or in the association with a criminal street gang (§186.22, subd. (b)). The court sentenced Lopez to prison for 90 years to life.

Lopez appeals, contending the court denied Lopez his right to counsel and then abused its discretion in declining to appoint Lopez's formerly retained counsel. In addition, Lopez argues this matter must be reversed or remanded for further hearing because the prosecutor refused to discover critical information, and in doing so, violated California's discovery law and the confrontation and due process clauses of the United States Constitution.

We conclude that the court did not deny Lopez his right to counsel. Lopez was an indigent defendant and the court was well within its discretion to appoint the public defender to represent Lopez instead of the private attorney who had handled his first trial.

However, under the unique facts of this case, we find merit in Lopez's argument the superior court erred in failing to hold a hearing regarding his request for additional discovery from the prosecution. Here, where the primary defense theory was misidentification and the credibility of the key prosecution witness was at issue, the

---

[1]      Statutory references are to the Penal Code unless otherwise specified.

possibility that the prosecution possessed information that the witness was a gang member and did not provide that information to the defense, despite requests to do so, warrants a closer look by the superior court. Thus, we reverse the judgment and remand the matter to the superior court to conduct a hearing as to the subject evidence requested at trial by Lopez's counsel. If the superior court determines that the subject evidence exists and is material, the judgment will be reversed and the subject evidence will be provided to Lopez. If the evidence does not exist or is not material, the superior court will issue an order declaring such and the judgment will be affirmed.

FACTUAL BACKGROUND

Prosecution

Byron Glass and Bobby Brookins were standing at a bus stop at Fifth Street and Arrowhead Avenue in San Bernardino on October 22, 2008, at about 10:00 p.m. Glass saw a car drive past the bus stop, traveling eastbound on Fifth towards Arrowhead. It was a 2004 or 2005 Chevy Tahoe or GMC Yukon, silver or light tan, with tinted windows in the back. The vehicle turned left, heading north on Arrowhead. The vehicle then made a right onto Sixth, and Glass lost sight of it. The next time Glass saw the vehicle, it had pulled into the parking lot behind the bus stop. The driver and front passenger doors opened, and two occupants got out.

The driver was wearing black clothing and a hooded sweatshirt with the hood up. Glass described the driver as about 6'1", 300 to 350 pounds, with a shaved head and a goatee. The passenger was shorter than the driver, and maybe 30 pounds lighter, wearing dark or black shorts and a black hoodie. The driver closed the car door and started

3

walking toward Brookins and Glass. The driver's hands were in the pockets of his sweatshirt.

As the driver approached, Glass thought there was going to be some kind of altercation at the very least because he did not know the driver. When the driver got to the gate near the bus stop, about four to four and a half feet away from Glass, he said, "What's up, fool?" The driver then pulled a gun from his right pocket and started shooting. The weapon was a black, semiautomatic firearm, about five to six inches long.

The first shot was at Glass's head, but he turned and ran, calling out for Brookins to do the same. As he zig-zagged, a bullet struck his lower back and exited from his side, another struck his elbow and went out through his forearm. Brookins died from gunshot wounds to his chest and abdomen.

San Bernardino Police Officer Sharon McFadden responded to a report of shots fired and found Glass lying near the sidewalk on D Street. Glass was hysterical and worried about Brookins's whereabouts. Glass gave a description of the shooter and the vehicle, and told the responding officer he thought he would be able to identify the shooter, but not the passenger in the SUV.

Eight .40 caliber shell casings were recovered from the crime scene. An expended bullet recovered from Brookins's body was consistent with the size and caliber of the shell casings found at the scene.

San Bernardino Police Officer Jason Heilman was on patrol the night of the shooting. Shortly after 10:00 p.m., he heard a broadcast regarding the shooting, describing the suspects as two Hispanic males driving a silver or tan Chevrolet Tahoe.

4

Later that evening, around 11:23 p.m., Heilman spotted a silver Chevrolet Tahoe traveling west on Fifth near Mount Vernon (about a mile to a mile and a half from the site of the shooting). That vehicle was registered to Lopez and Ruben Lopez. Heilman followed the SUV as it turned north onto Cabrera, noting that it was traveling faster than the residential speed limit. When the car turned left onto Sixth Street, the officer activated his lights to conduct a traffic stop. Lopez was driving the car. The passenger was identified as Chayo Cabrera. No weapons were found on either man or in the vehicle. Lopez was wearing a white T-shirt and blue jeans. There were a few small stains on the bottom of his shirt that appeared to be dried blood. Lopez had a shaved head and no facial hair, but had what looked like two small fresh shaving cuts and he appeared to have shaved very recently. Lopez had a police scanner in his vehicle. The scanner was on at the time of the stop. Lopez told Heilman that he was "from" the Mount Vernon Gang, and he hung out with or grew up in the Sur Crazy Ones area, but that all his gang ties were in the past.

Another officer brought a witness to the scene of the traffic stop, Earnestina Alfaro, who had seen the shooting from inside her apartment. After Alfaro said that Lopez and Cabrera were not the two men she saw, Lopez was cited for possession of marijuana and released.[2]

Detective Glenn O'Neil interviewed Glass at his home, the morning after the shooting, following his release from the hospital. When shown a photographic lineup,

---

[2] At trial, the prosecution offered evidence that it was not possible to discern facial features when looking at people at the bus stop from Alfaro's apartment.

Glass identified Lopez as the shooter. Lopez turned himself in on October 30, 2008, eight days after the murder.

Officer Raymond Bonshire, a gang expert, explained the structure, organization, and culture of criminal street gangs, and how law enforcement identifies street gangs and gang members. West Side Verdugo has been around since the 1950s. Their area of geographical influence is the west side of San Bernardino, west of Interstate 215. The gang also is referred to as Mount Vernon, after one of the main streets running through that area. There are several cliques, or subsets of West Side Verdugo, including Sur Crazy Ones, Lil Counts, Seventh Street, and Manorboyz. West Side Verdugo has over 1,000 members and is the largest criminal street gang in San Bernardino County! (4 RT 806)! West Side Verdugo uses a common sign or signal of "WSV." Some of the subsets use other symbols—"SCO" or "C1" for Sur Crazy Ones, "LCG" for Lil Counts, "7" or "Calle Siete Locos" or "CSL" for Seventh Street, and "MB" for Manorboyz. Because Verdugo means "executioner," WSV gang members might use a tattoo of an executioner as a symbol of the gang. Longtime members might also use "MVR" or "Mount Vernon Rifas" to represent the gang.

WSV's primary activities are narcotic sales, robberies, assaults, and murders. WSV gang members Adam Nava and Sammy Miranda committed a robbery in June 2008. WSV gang member Jesse Lopez committed an attempted murder in December 2007 for the benefit of a criminal street gang. WSV gang member Jaime Castrellon committed robbery and assault by means likely to produce great bodily injury in April

6

2007. WSV gang members Henry Ruiz and Ralph Ryan committed murder in April 2005.

Bonshire opined that Lopez is a member of WSV and the subset Sur Crazy Ones, based on his tattoos, his association with other gang members, prior contacts with law enforcement in the gang area, and his own admission. When given a hypothetical based on the facts of the instant crimes, Bonshire opined that the crimes were committed for the benefit of a criminal street gang because the crimes would increase the perpetrator's status and reputation within the gang, and the gang's reputation within the community, especially if the victims are suspected of being members of another gang.

Defense

Lopez's primary defense at trial was misidentification. His defense disputed Glass's identification of Lopez as the shooter. To this end, a 911 call made by Tony Prado, a witness to the shooting, was played for the jury. Prado described the shooter's vehicle as a pewter or light brown Chevrolet Tahoe. He said that that he was too far away to see the shots being fired. He described the shooter as a male, wearing black, perhaps a black leather coat. He could not determine the race of the shooter. Prado told a responding officer that there were two suspects, both wearing black leather jackets.

Prado's January 2009 interview with Detective Vasilis was also played for the jury. In the interview, he said the shooter was 5'9", around 180 or 190 pounds, wearing a black coat, and perhaps dark jeans. Prado told the detectives that the suspects might have been Hispanic because both had black hair and darker skin.

7

Alfaro's prior testimony from the first trial was read for the jury. Alfaro described the suspects as two Hispanic males—the first man was about 6'3" and 220 pounds, and the second about 5'9" and 195 pounds. Alfaro said both were clean shaven, with black hair. Alfaro was taken to the scene of the traffic stop where Lopez and Cabrera had been detained. According to Alfaro, neither Lopez nor Cabrera were the shooter, and Lopez's vehicle was not the vehicle she saw at the scene of the shooting.

Vasilis testified that at the time Lopez was stopped an hour after the shooting, Lopez did not have a goatee. He did have scratches, but there was no description in the reports of the officer making the stop that they were shaving cuts until that officer, while testifying at the July 2010 trial, mentioned a shaving cut.

Dr. Deborah Davis, an expert on identification, testified to factors, myths, and causes of misidentification of people.

DISCUSSION

I

*CHOICE OF COUNSEL*

A. Lopez's Contentions

Lopez claims that the superior court's decision to relieve Bob Bernstein as his attorney before his second trial denied Lopez his right to counsel. Lopez maintains that the court's decision violated California law as well as the United States Constitution. In addition, he argues that the court abused its discretion in declining to appoint Bernstein as his counsel for his second trial. We reject these contentions.

8

B. Background

Bernstein was Lopez's trial counsel during his first trial. Before the beginning of Lopez's second trial, Bernstein applied ex parte to be appointed as counsel for Lopez in connection with the retrial. Bernstein argued that the court should appoint him as counsel under *Harris v. Superior Court* (1977) 19 Cal.3d 786 (*Harris*).) In his supporting papers, Bernstein noted he had developed a strong relationship of trust with Lopez. He also stated that he was very familiar with Lopez's case and his appointment would save judicial and county resources in eliminating the time a new attorney would need to spend to become familiar with the case and prepare for trial. In addition, Bernstein represented to the court that Lopez and his family could no longer pay for his legal services.

At the hearing on the ex parte application, the court commented that it was an "unsettled question under California law whether *Harris*[, *supra*, 19 Cal.3d 786] applies in circumstances such as this where the public defender is available to represent a criminal defendant[.]" The court further noted that "the plain language of the statute suggests that the Court should give priority to the Public Defender's Office to represent a criminal defendant, if the Public Defender's Office is available."

The court therefore relieved Bernstein as counsel for Lopez and denied the application that Bernstein be appointed as counsel. Then the court appointed the Public Defender's Office to represent Lopez.

At the hearing, Bernstein did not indicate that he wished to continue to represent Lopez even if the court would not appoint him as counsel. Nor did he object when the court relieved him as counsel. Instead, Bernstein conferred with Lopez about his right to

9

a speedy trial and whether he would allow additional time to bring the case to trial to give his new attorney time to become familiar with the case. Bernstein also agreed to provide discovery to the Public Defender's Office.

When the court appointed the Public Defender's Office to represent Lopez, Lopez did not object. He asked the court whether his new attorney would have the same expertise as Bernstein. The court informed Lopez that the Public Defender's Office is filled with "excellent lawyers" but it did not have control over who from that office would represent Lopez. Lopez did not complain, but merely responded, "Okay. Thank you."

## C. Analysis

As a threshold matter, we observe that no federal or state constitution is implicated in connection with the court declining to appoint Bernstein as counsel for Lopez. It is undisputed that Lopez was indigent when Bernstein applied to be appointed his counsel. Indeed, the sole reason Bernstein applied to the court was that "Lopez [was] unable to retain [his] services for further legal representation as he and his family ha[ve] exhausted all of their financial means . . . ." As a matter of federal constitutional law, "the right to counsel of choice does not extend to defendants who require counsel to be appointed for them." (*United States v. Gonzalez-Lopez* (2006) 548 U.S. 140, 151.) Our high court is in accord with the United States Supreme Court on this issue, "the state Constitution does not give an indigent defendant the right to select a court-appointed attorney." (*People v. Jones* (2004) 33 Cal.4th 234, 244; italics omitted.) Here, Lopez does not argue that he

10

could pay for Bernstein's services or a different private attorney. He was indigent. Thus, he was not entitled to the counsel of his choice.

Nevertheless, Lopez argues that the court's removal of Bernstein as his counsel violated Code of Civil Procedure section 284. That section allows both the attorney and the client to consent to a change of attorney. It also permits either the client or the attorney to request an order from the court changing the attorney. (See Code of Civ. Proc., § 284.)[3] We agree that the parties did not consent to change counsel under Code of Civil Procedure section 284 and no one applied under that section to change counsel. However, it is clear the court interpreted Bernstein's request to be appointed counsel as a request to be relieved as counsel if the court was not going to appoint him. Bernstein did nothing to disabuse the court of this notion. When the court did relieve Bernstein as Lopez's counsel, neither Bernstein nor Lopez objected or otherwise argued that the court was violating Code of Civil Procedure section 284. As such, Lopez forfeited any argument that the court allegedly violated Code of Civil Procedure section 284. (See *People v. Foster* (2010) 50 Cal.4th 1301, 1324.)

Moreover, the court's belief that Bernstein's ex parte application was a request to be relieved as counsel if not appointed is well founded. As we discuss above, Bernstein did not object when the court relieved him as counsel. Further, there is no indication that Bernstein was willing to represent Lopez if Lopez or the state would not pay for his legal services. In fact, before the first trial, Bernstein was relieved as Lopez's counsel and a

_____

3      Code of Civil Procedure section 284 applies to criminal cases. (*Smith v. Superior Court* (1968) 68 Cal.2d 547, 558.)

11

public defender was appointed to represent Lopez because Lopez could not afford to pay for Bernstein's services. Only after Lopez's family expressed the ability to pay Bernstein for his services did he agree to again represent Lopez in the first trial. Because Lopez and his family could not pay for his services for the second trial, Bernstein asked the court to appoint him as counsel. When it did not do so, Bernstein appeared to have no problem with providing his discovery to the Public Defender's Office and allowing a different attorney to represent Lopez.

Having determined that the court did not err in relieving Bernstein as counsel for Lopez, we next consider whether the court abused its discretion in appointing the Public Defender's Office instead of Bernstein to represent Lopez. The appointment of an attorney for an indigent defendant rests wholly within the sound discretion of the trial court. (*Harris*, *supra*, 19 Cal.3d at p. 796.)

Lopez argues that under *Harris*, *supra*, 19 Cal.3d 786, the trial court here abused its discretion by declining to appoint Bernstein. We disagree.

In *Harris*, our Supreme Court observed that a trial court is required to consider the defendant's choice and various objective factors in appointing private counsel where the public defender is not available. (*Harris*, *supra*, 19 Cal.3d at pp. 795-796.) Here, the public defender was available; therefore, *Harris* is not helpful to Lopez's position.

The court did not appoint Bernstein as Lopez's counsel primarily because it believed the applicable statute suggested that the court give priority to the Public Defender's Office in appointing counsel for indigent defendants. We agree. "[T]he court shall first utilize the services of the public defender to provide criminal defense services

12

for indigent defendants."  (§ 987.2, subd. (e).)  We are satisfied that the trial court did not abuse its discretion in appointing the Public Defender's Office to represent Lopez.  The priority given to the appointment of the Public Defender's Office is clearly set forth in section 987.2 and Government Code section 27706.  "Those statutes provide that a court must first utilize the services of the public defender in providing criminal defense services for indigent defendants, if the public defender is available to try the matter." (*Joshua P. v. Superior Court* (2014) 226 Cal.App.4th 957, 964, citing *Williams v. Superior Court* (1996) 46 Cal.App.4th 320, 329.)

Further, we conclude the trial court's decision to decline to appoint Bernstein was not an abuse of discretion, even though Lopez had a relationship of trust with Bernstein and expressed a desire to have Bernstein be appointed.  "An indigent defendant's preference for a particular attorney, while it is to be considered by the trial court in making an appointment [citation], is not a determinative factor requiring the appointment of that attorney — even in combination with other relevant factors such as the subject attorney's competence and availability." (*Harris*, *supra*, 19 Ca1.3d at pp. 795-796; italics omitted.)  Where the preference is based on a relationship of trust and confidence in requested counsel, established by previous representation in related proceedings, the preference is significant, although "appointment of the requested attorney is not compelled because the defendant unexplainedly lacks confidence in and refuses to cooperate with any attorney other than the requested attorney [citation], or because the defendant has trust and confidence in the requested attorney." (*Alexander v. Superior Court* (1994) 22 Cal.App.4th 901, 915.)

As we discuss above, *Harris*, *supra*, 19 Cal.3d 786 is not instructive here because there was no conflict preventing the Public Defender's Office from representing Lopez. In addition, *Harris* involved rather extreme facts that are not analogous to the instant matter. In *Harris*, the counsel that the petitioners preferred had already represented them for several years in a number of prosecutions arising from activities involving the Symbionese Liberation Army (SLA). Counsel made a highly detailed showing of both the duration and complexities of the relationship, which included: several years of representation; familiarity with the particularities of the SLA and other legal matters involving that group; experience in coordinating facts and trial strategies with attorneys for eight other defendants subject to criminal proceedings for participation in SLA activities; development of legal strategies in other matters that would be used in the present case; and familiarity with vast amounts of documentary evidence amassed by governmental agencies, including the Federal Bureau of Investigation, concerning the SLA. (*Id.* at pp. 797-798, fn. 10.) The court noted that this extensive prior experience "not only established a close working relationship between [petitioners] and [preferred counsel], but also served to provide those attorneys with an extensive background in various factual and legal matters which may well become relevant in the instant proceeding—a background which any other attorney appointed to the case would necessarily be called upon to acquire." (*Id*. at p. 798.) It would require "expenditure of considerable energy and time . . . to bring their level of familiarity with those facts and

14

issues to a point comparable with that already reached by [preferred counsel]." (*Id.* at p. 799.)[4]

The facts in the record here pale in comparison to those in *Harris*. Lopez explains that Bernstein represented him in the previous trial and was familiar with the case. Also, Lopez expressed trust and confidence in Bernstein. However, contrary to the petitioners' requested attorneys in *Harris*, Bernstein had not represented Lopez in a variety of complex legal matters over a period of years. Further, there is no indication that the instant matter presented any specific complexities making Bernstein's familiarity significant. To the contrary, here the trial consisted of a few eye witnesses to a shooting at a bus stop. On the record before us, it is clear that Lopez's preference was countered by "countervailing considerations of comparable weight," i.e., the statutory preference for appointing public defense counsel over private attorneys where the public defender is available and there is no conflict. (*Harris*, *supra*, 19 Cal.3d at p. 799; § 987.2, subd. (e).) Therefore, the trial court was well within its discretion in finding that the circumstances did not justify a departure from the established appointment system, which required the court to appoint the Public Defender's Office when available.

---

4    We also note that the counsel the trial court did appoint for the petitioners vigorously supported the petitioners' position that their requested private attorneys be appointed in their stead. (*Harris*, *supra*, 19 Cal.3d at p. 798.)

15

## II

### *DISCOVERY OF GANG EVIDENCE*

#### A.  Lopez's Contentions

Before his second trial, Lopez sought discovery that Glass and/or Brookins were gang members.  To this end, he questioned whether the CalGang database contained information regarding Glass and Brookins.  The CalGang database is a statewide database containing information about gang members and associates of gang members. The court denied Lopez's motion, including declining to order the prosecutor to have the CalGang database reviewed to discover whether it contained any information about Glass's and Brookins's involvement with criminal street gangs.  In addition, the court would not allow Lopez's trial counsel to examine the officer who looked for information to determine whether Glass or Brookins were members or associates of any criminal street gang about searching the CalGang database.

#### B.  Background

Prior to the second trial, Lopez's counsel filed a motion to compel discovery seeking, among other things, "Any and all evidence of gang participation or association of any kind, including encounters with police, of Byron Glass and Bobby B[r]ookins."  In support of the motion, Lopez's counsel noted Glass's testimony during the first trial where he testified that he was affiliated with a gang.  The defense thus requested any field interview cards that showed gang participation by Glass or Brookins.

In response, the prosecution argued that the information requested had either already been provided or did not exist, or that discovery was not required under section

16

1054.1 or other authority, and that the defense was not entitled to a hearing as to where the prosecution had looked to find the requested discovery.

At the hearing on the motion, Lopez's counsel told the court that he was seeking evidence of gang participation or association of any kind by Glass or Brookins. The prosecution responded that it had asked the gang investigator, Officer Ray Bonshire, for the information requested by the defense, and that no such information was found. Lopez's counsel maintained that in light of Glass's testimony at the first trial, it was likely that Glass would have had police encounters or field interview cards documented by law enforcement. Thus, Lopez's counsel asked that the prosecution be required to search the CalGang database to ascertain if there were any documented encounters with Glass or Brookins. Lopez's counsel asserted that any gang affiliation would affect Glass's credibility and that a gang witness might shade his testimony or lie to implicate Lopez, a possible rival gang member, in a gang crime. Lopez's counsel argued that merely inquiring of the gang investigator was inadequate to satisfy the prosecutor's obligation under *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*)), and the trial court should require the officer to testify at a discovery compliance hearing as to what investigative tools he had to locate gang information.

Lopez's counsel specifically mentioned a statewide database (CalGang) that the prosecution could "tap into when they want to." The court then questioned the prosecutor regarding the database, and the prosecutor replied that he did not know what database Lopez's counsel was referring to. The court did not want the prosecutor to get distracted

17

by what specific database Lopez's counsel was referring to, but instead, inquired as follows:

> "No. I don't care what he is referring to. I want to know if you know of a source, a statewide or any type of a data source, whether it is local, Statewide, or national that San Bernardino PD has access to, which would give them a clue as to whether or not Mr. Glass or Mr. Brookins has any association or connection with a criminal street gang."

The prosecutor indicated his understanding was that the San Bernardino police department relied on its local departmental records and the San Bernardino Sheriff's Department classification sheets, its own police reports and officers to determine whether a particular individual was a gang member. Those were the only sources used and relied on in conducting the investigation. According to the prosecutor, the San Bernardino Police Department does not rely on the CalGang database, and he did not know whether the police had searched that database in investigating the instant matter.

The court, relying on *Barnett v. Superior Court* (2010) 50 Ca1.4th 890 (*Barnett*), declined either to order the prosecution to conduct the search or to conduct a hearing into the gang officer's efforts to locate gang information related to the victims. The court explained:

> "Okay. Well, what I would suggest is I'm going to deny a request to have a [hearing]. I'm not going to make this, particularly [Lopez's trial counsel], for the practical purpose of not setting a precedence that every time a defense attorney is disappointed by not getting the type of response to a discovery request they wish, that they haul somebody in before a judge, such as myself, and have a hearing and examine them as to what they searched or what they haven't searched. Or what exists or what does not exist. I'm going to rely on the good faith of the prosecution team led by the District Attorney's office, and specifically right now [prosecutor], and I

18

would expect that specifically as to Cal Gangs, which is the only data source which I'm aware as a former prosecutor, I would expect that that is something that the prosecution team, any part of the prosecution team, uses to engage in research with respect to gang membership. I would think it would be incumbent upon you to do so in order to respond to your discovery request. And [woe] be to their peril should it later be discovered that we go through trial and that information was there and it was not produced. It would go very poorly for them, if that were the case. I am going to rely on their good faith and say if they say there is nothing there, then there is nothing there."

In response to the court's ruling, Lopez's trial counsel pointed out that the prosecutor indicated that he was not sure if the CalGang database had been reviewed by the prosecution team[5] in the instant matter. Counsel then asked the court to order the prosecutor to search the CalGang database. The court declined to issue such an order, but noted:

"I think [the prosecutor] understands fairly clearly that based on my experience that is an available database for the prosecution team to consult in order to comply with [the] discovery request. I think the discovery request is appropriate and I would say that the information should be produced to [Lopez's trial counsel], unless some type of privilege is asserted and presented to me. But if it does exist, then I think the discovery request is appropriate and should be complied with, if it exists. And if they search and find it, they will give it to you. And if they search and don't find it, they can remain silent or tell you that it's not there. If they don't search and it's later found, then I'll have to hurt them. I'll be happy too."

The issue of whether the CalGang database was searched by the prosecution did not disappear after the court's denial of Lopez's discovery motion. In his trial brief, the

---

5     The prosecution team includes both investigative and prosecutorial agencies and personnel. (See *In re Brown* (1998) 17 Cal.4th 873, 878; *People v. Robinson* (1995) 31 Cal.App.4th 494, 499.)

prosecutor asked that Lopez be prohibited from asking the gang expert about the CalGang database. The prosecutor noted that although Glass testified at the first trial that he "associated" with a Blood gang, the investigators had no information linking Glass to a gang until that testimony. The prosecutor had since made numerous requests for any gang cards, contacts, or police reports linking Glass to a gang, but nothing was found. The prosecutor additionally contended that if the CalGang database existed, the information contained therein was privileged under Evidence Code section 1040. The prosecution further argued that it was not required to produce information in the possession of other agencies not involved in the investigation or prosecution of the case.

At a pretrial hearing, Lopez's counsel explained that it would like to cross-examine the gang expert as to the victims' gang affiliation and as to the extent of police investigation into any gang affiliation. The court ruled that defense counsel would not be permitted to ask the witness where he searched for gang information.

At trial, Glass testified that the former deputy district attorney had told him that Brookins was a gang member. Lopez's trial counsel then moved for a mistrial. Lopez's counsel asked for a hearing regarding whether there had been a discovery violation with respect to gang information involving Brookins or Glass.

In a hearing outside the presence of the jurors, the prosecutor unsuccessfully sought to have Glass's testimony stricken as hearsay. The trial court denied the objection as untimely. During an Evidence Code section 402 hearing, the prosecutor from Lopez's first trial testified. She recalled telling Glass that she knew he and his cousin were involved in gangs, but did not "recall specifically knowing that either were a gang

20

member." However, on cross-examination, the former prosecutor admitted that "based on her personal experience having prosecuted gang cases," she believed Brookins was a gang member.

At trial, Detective Francisco Hernandez testified that he was told by McFadden, who investigated the crime scene, that Glass and Brookins may have been associates of the Pasadena Denver Lane Gang. Hernandez stated that he checked the records of the San Bernardino Police Department and did not find any records of the victims as gang members or affiliates of any gang. Hernandez could not remember if he contacted anyone from Pasadena or any other law enforcement agency about the Pasadena Denver Lane Gang or the victims.

Bonshire also testified as a gang expert for the prosecution. He stated that he did not find any gang documentation on Glass. He explained that he looked for such documentation in the San Bernardino police department's gang unit files and gang management system (that only involves information gathered by the San Bernardino police department and is not linked to any other law enforcement). He admitted that he did not call the Pasadena police department or inquire with the Los Angeles police department regarding Glass's gang involvement. Bonshire opined that Glass was an associate of the Pasadena Denver Lane Gang based on Glass's self-admission and previous trial testimony. In addition, there was other testimony that Glass was "flying gang colors" while at the bus stop when he was shot (i.e., he was wearing red, which is a color associated with the Bloods criminal street gang).

21

During his closing argument, the prosecutor emphasized that there was no evidence that Glass was a gang member.

## C.  Analysis

On appeal, Lopez contends the prosecutor's failure to search the CalGang database and disclose any information regarding the victims' gang involvement was prejudicial misconduct in violation of both the state reciprocal discovery statute and the federal constitutional obligation, under *Brady*, *supra,* 373 U.S. 83, not to suppress evidence materially favorable to the defense.

The federal due process clause prohibits the prosecution from suppressing evidence materially favorable to the accused. The duty of disclosure exists regardless of good or bad faith, and regardless of whether the defense has requested the materials. (*United States v. Agurs* (1976) 427 U.S. 97, 107; *Brady*, *supra*, 373 U.S. at pp. 87-88.)

In *Brady, supra,* 373 U.S. 83, the United States Supreme Court held that under the due process clause of the Fourteenth Amendment to the United States Constitution, the prosecution must disclose to the defense any evidence that (1) is "favorable to the accused," (2) "material," and (3) was " 'suppressed' by the government."  (*People v. Salazar* (2005) 35 Cal.4th 1031, 1047-1048.)

For *Brady* purposes, evidence is favorable if it helps the defense or hurts the prosecution, as by impeaching a prosecution witness.  (*United States v. Bagley* (1985) 473 U.S. 667, 674-676; *In re Sassounian* (1995) 9 Cal.4th 535, 544.)  Evidence is material if there is a reasonable probability its disclosure would have altered the trial result.  (E.g., *Banks v. Dretke* (2004) 540 U.S. 668, 699.)  Materiality includes

22

consideration of the effect of the nondisclosure on defense investigations and trial strategies. (*Bagley*, *supra*, at pp. 682–683; see *In re Brown* (1998) 17 Cal.4th 873, 887 (*Brown*).) Because a constitutional violation occurs only if the suppressed evidence was material by these standards, a finding that *Brady* was not satisfied is reversible without need for further harmless error review. (*Kyles v. Whitley* (1995) 514 U.S. 419, 435 (*Kyles*).)

To meet the third of the *Brady* requirements, it is not necessary that the defendant show the evidence was in the sole possession of the prosecutor. "Under *Brady*, the prosecutor's duty extends to evidence 'known to the others acting on the government's behalf.' " (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1133, quoting *Kyles*, *supra*, 514 U.S. at p. 437.) However " 'the prosecution cannot reasonably be held responsible for evidence in the possession of all government agencies, including those not involved in the investigation or prosecution of the case. . . . "[I]nformation possessed by an agency that has no connection to the investigation or prosecution of the criminal charge against the defendant is not possessed by the prosecution team, and the prosecutor does not have the duty to search for or to disclose such material." [Citation.]' (*In re Steele* (2004) 32 Cal.4th 682, 697 (*Steele*); see also *Brown*, *supra*, 17 Cal.4th 873, 879 [*Brady* duty concerns evidence possessed by the " ' " 'prosecution team,' " ' " which includes ' " ' "both investigative and prosecutorial personnel" ' " '].)" (*Zambrano*, *supra*, at p. 1133.)

In addition to the prosecution's obligations under *Brady, supra,* 373 U.S. 83, per California's reciprocal discovery law (§ 1054 et seq.), prosecutors have a duty to disclose certain enumerated "materials and information" (§ 1054.1), including "[a]ny exculpatory

evidence" (§ 1054.1, subd. (e)), if such items are in the possession of the prosecutor or if the prosecutor knows them to be in the possession of "investigating agencies" (§ 1054.1). (*People v. Superior Court* (*Barrett*) (2000) 80 Cal.App.4th 1305, 1312 (*Barrett*).) The prosecutor's duty under *Brady* is "independent from the statutory duty contained in section 1054.1, subdivision (e)." (*Barrett*, *supra*, at p. 1314.)

The People argue that Lopez cannot establish any of the three elements of a *Brady* violation. To this end, the People maintain there is no evidence in the record that the CalGang database contains any information that was not turned over. They are correct, but they overlook a crucial point. Lopez had no access to the database. As such, Lopez had no means to show what evidence regarding Glass, if any, was contained in the CalGang database. Indeed, Lopez's lack of access to the database was the impetus for his discovery request and desire for a hearing regarding the prosecution's efforts to provide discovery.

Although the court stopped short of ordering the prosecution to check the CalGang database, the court did note that it believed the "discovery request [was] appropriate" and stated that "the information should be produced to [Lopez's counsel], unless some type of privilege is asserted and presented to me." Moreover, additional comments from the court indicated that it believed the database would be searched and responsive information provided unless a privilege existed. We find it difficult to reconcile the court's comments with its unwillingness to order the prosecution to search the CalGang database for the requested information. That said, the only plausible explanation is that the court believed the prosecution would search the CalGang database and provide Lopez

24

with any material information it found.  In fact, the court cautioned the prosecutor that there would be severe consequences if the prosecutor did not have the CalGang database searched, but the requested information was later found.

Like the People's arguments under *Brady*, *supra*, 373 U.S. 83, the court's warning to the prosecution regarding failing to search the CalGang database suffers from the same flaw.  Lopez did not have access to the database.  He could not search it.  Therefore, Lopez had no mechanism by which to check the prosecution's efforts.  There was no chance that Lopez would know what, if anything, the CalGang database contained about Glass or Brookins, if the prosecutor chose not to search the database.  Accordingly, the court's warning to the prosecutor was of little consequence.  The prosecutor apparently did not have the database searched, and now on appeal, we do not know what material information, if any, the CalGang database contained as to the victims in this case.

Therefore, we now must determine whether the prosecutor should have had his team search the CalGang database.  On the record before us, the answer is yes.

"A prosecutor has a duty to search for and disclose exculpatory evidence if the evidence is possessed by a person or agency that has been used by the prosecutor or the investigating agency to assist the prosecution or the investigating agency in its work." (*Barrett*, *supra*, 80 Cal.App.4th at p. 1315.)  "Conversely, a prosecutor does not have a duty to disclose exculpatory evidence or information to a defendant unless the prosecution team actually or constructively possesses that evidence or information.  Thus, information possessed by an agency that has no connection to the investigation or prosecution of the criminal charge against the defendant is not possessed by the

25

prosecution team, and the prosecutor does not have the duty to search for or to disclose such material." (*Ibid*.)

Citing *Barrett, supra,* 80 Cal.App.4[th] 1305, the People argue they did not have a duty to search the CalGang database. Their reliance on that case is misplaced.

In *Barrett*, a criminal defendant charged with the murder of his prison cellmate requested pretrial discovery from the Imperial County District Attorney of records maintained by the California Department of Corrections,[6] including logs from the administrative segregation unit and incident logs. (*Barrett*, *supra*, 80 Cal.App.4th at pp. 1309-1310.) After the trial court ordered the District Attorney to produce the materials, the District Attorney petitioned for a writ of prohibition. (*Id*. at p. 1309.) We concluded that the prosecution had no duty to produce most of these records because in maintaining them, the CDC was not acting as an investigating agency. (*Id*. at pp. 1317–1320.)

We explained: "[T]he status of CDC in this case is not straightforward. In addition to being an investigatory agency in the homicide prosecution, CDC first and foremost supervises, manages and controls the state prisons. . . . [Citations.] CDC is a distinct and separate governmental entity from the District Attorney. . . . Thus, for our purposes, CDC has a hybrid status: part investigatory agency, and part third party." (*Barrett*, *supra*, 80 Cal.App.4th at p. 1318.)

---

6      At the time of the *Barrett* opinion, the California Department of Corrections and Rehabilitation was known as the California Department of Corrections (CDC).

"With respect to CDC's role as an investigatory agency, [defendant] can only compel discovery of materials generated or maintained by CDC relating to its investigation of the . . . homicide. . . . [¶] However, the bulk of the . . . CDC documents . . . , most of which predate the homicide, are records kept by CDC in the course of running the prison. [Citation.] [Defendant] cannot rely on [section 1054 et seq.] for discovery of materials from CDC that are strictly related to its operation of Calipatria State Prison, that is, materials CDC generated when it was not acting as part of the prosecution team. To the extent [defendant] is seeking records that CDC maintains in the regular course of running Calipatria State Prison, [defendant] is trying to obtain material from a third party." (*Barrett*, *supra*, 80 Cal.App.4th at pp. 1317-1318.) "We conclude that to obtain materials from CDC in its capacity as the administrator of the state prison system, [defendant] must resort to a subpoena duces tecum." (*Id*. at p. 1318.)

Here, the issue before us is not analogous to what we addressed in *Barrett*, *supra*, 80 Cal.App.4th 1305. Lopez was not seeking administrative documents from a third party. He was not asking for documents that had a tenuous relationship, at best, to the investigation of a crime. Instead, he sought information from a database that apparently contains information, on a state wide level, regarding criminal street gangs as well as members and associates of those gangs. Unlike the administrative records at issue in *Barrett*, the information requested here potentially related to the investigation of the subject crimes, namely the victims' involvement with criminal street gangs.

Lopez contends the prosecution team had access to the CalGang database. The People do not argue otherwise. Nevertheless, the People claim that merely having access

27

is not the same as possession.  Although we agree with this distinction, here, we are not persuaded that this distinction matters.

The People's position relies on their argument that the prosecution did not have to search the CalGang database in response to Lopez's discovery request because it did not use that database during its investigation.  However, simply because a prosecution team may not choose to utilize an investigative tool at its disposal does not mean the prosecution team did not at least have constructive possession of that investigative tool, and as such, the information contained within it.  Put differently, the fact that the prosecution team here chose not to use the CalGang database is not of the moment if it could have used the database for its investigation, but simply chose not to do so.

Here, we are concerned about Lopez's access to potentially material information that he cannot obtain except from the prosecution.  In this sense, we agree with Lopez that the prosecution's failure to have the CalGang database searched and produce any material evidence regarding the victims' gang involvement possibly impacted his due process rights.  (See *Pennsylvania v. Ritchie* (1987) 480 U.S. 39, 57 (*Ritchie*).)

The People discount Lopez's due process concerns by returning to their argument that if the prosecution did not use the CalGang database in their investigation of the subject crimes, it did not have to search the database and provide any responsive information.  We are not persuaded.  To the contrary, we are concerned that the prosecution is suggesting a rule that limits discoverable material only to those sources that the prosecution actually uses even if other sources and/or investigative tools are otherwise available to the prosecution to aid in its investigation.

28

Here, we find it important that the People have not argued that the prosecution team could not access the CalGang database and use the information it found there for its investigation of the instant matter. Indeed, the superior court judge who denied Lopez's discovery motion thought Lopez's request for information possibly contained in the CalGang database was reasonable and described the CalGang database as "an available database for the prosecution team to consult in order to comply with [the] discovery request." The People have not provided a convincing argument why the superior court's conclusion was incorrect. Moreover, accessing the CalGang database for information about the victims is not unlike the prosecution providing the defense with the criminal history of certain prosecution witnesses, which it is required to do. (See § 1054.1, subd. (d); *People v. Little* (1997) 59 Cal.App.4th 426, 433-434 [prosecution must investigate key prosecution witness's criminal history and disclose felony convictions]; *People v. Santos* (1994) 30 Cal.App.4th 169, 178-179 [upon defense request, prosecution must disclose prosecution witnesses' misdemeanor convictions]; *People v. Hayes* (1992) 3 Cal.App.4th 1238, 1243, 1245 [upon defense request, prosecution must disclose prosecution witness's criminal convictions, pending charges, probation status, acts of dishonesty, and prior false reports].) The criminal history is not in the direct possession of the prosecutor, but the prosecutor can easily obtain it. The same can be said of the information in the CalGang database.

We also note that Lopez contends, and the People do not dispute, that that the San Bernardino Sheriff's Department maintains one of CalGang's regional databases. Further, the prosecutor represented that his team used the San Bernardino Sheriff's Department

29

classification sheets.  And the People have articulated no impediment to the prosecution team using the CalGang database in the investigation here.  As such, it is difficult to come to any conclusion, but that the prosecution team had possession of the CalGang database.

The People also contend that Lopez is not entitled to any information contained in the CalGang database because he has not shown that it would be material.  Consequently, the People argue that Lopez must show there exists "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.  A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome."  (*Brady*, *supra*, 473 U.S. at p. 682.)  Here, again, we are faced with the problem that Lopez lacked access to the desired information so he cannot show that it was material.  (See *Ritchie, supra*, 480 U.S. at p. 57 ["At this stage, of course, it is impossible to say whether any information in the . . . records may be relevant to [the defendant's] claim of innocence, because neither the prosecution nor defense counsel has seen the information, and the trial judge acknowledged that he had not reviewed the full file."].)

The People, however, anticipate this shortcoming and assume the CalGang database would contain evidence of the victims' gang involvement that would have been favorable, impeachment evidence.  Nevertheless, the People argue that this additional evidence would not have made a difference at trial because "the issue of Glass's and Brookins's alleged gang connection was thoroughly explored through Glass's testimony

and through the testimony of the gang expert and other law enforcement witnesses." On the record before us, we are not so confident.

It is clear that Lopez's trial attorney wanted to paint the victims in the instant matter as gang members. He could not do so because he did not have any evidence of their gang involvement beyond Glass's admission that he associated with the Pasadena Denver Lane Gang. The prosecutor focused on this shortcoming. In fact, during the prosecutor's closing argument, he emphasized the importance of Lopez's lack of evidence that Glass was a gang member:

> "What kind of witness would you have expected in a gang case? A gang member? Now, I know [Lopez's trial counsel] is going to tell you that Byron Glass is a gang member, and this from right from the get-go this where you have to consider what I just said about speculation. What evidence do you have in this case to suggest that Byron Glass is a gang member? The answer is simple: There isn't any. The only evidence that -- that -- that came forward is -- is that Byron Glass was sitting on a park bench --"

The prosecutor also stated:

> "Mr. Glass has forever maintained that he has family in a gang known as the Pasadena Denver Lanes. He has never not once, never not ever claimed membership in that gang. He says he associates by his family relationship with the people that are in that gang. He has no criminal record. There are no Gang cards . . . ."

In addition, the prosecutor pointed out yet again, "There were no Gang Cards presented by either side to support the fact that Mr. Glass or Mr. Brookins was a gang member."

The prosecutor maintained that Lopez's trial counsel's theory was that Glass was a gang member, but emphasized there was no evidence that Glass actually was a gang member. If evidence of the victims' gang involvement would not have been helpful at

31

Lopez's trial, it begs the question why the prosecutor focused on this shortcoming at the beginning of his closing argument. In short, we are not persuaded that additional evidence of the victims' gang involvement would not have produced a different result. Put differently, without a resolution of the existence of material evidence on the CalGang database regarding the victims, we do not have confidence in the outcome of Lopez's second trial.

On remand, the superior court shall hold a hearing regarding Lopez's discovery motion involving the CalGang database. The court shall order the prosecution team to search that database to determine whether it contains any information regarding the victims. If it does, then the prosecution team shall produce such information for an in camera inspection by the court. After reviewing the evidence, the court must determine if it is material under *Brady*, *supra*, 373 U.S. 83, i.e., there is a reasonable probability its disclosure would have altered the trial result. If the court makes such a determination, it shall turn over the information to Lopez and order a new trial. However, prior to turning over the information, the prosecutor may argue the information is privileged under Evidence Code section 1040 and the court can consider the issue and act accordingly.

If the CalGang database does not contain material information about the victims, then the judgment is ordered reinstated and affirmed.

DISPOSITION

The judgment is reversed and the cause is remanded to the superior court with directions to hold a hearing on Lopez's discovery motion consistent with this opinion. If the hearing reveals no discoverable information, the superior court shall reinstate the

32

original judgment and sentence, which will stand affirmed.  If the hearing reveals material, discoverable information bearing on the victims' status as gang members helpful to Lopez in defense of the charges here, the superior court shall grant the requested discovery and order a new trial if it finds a reasonable probability that a different outcome would have occurred had the information been provided Lopez.

HUFFMAN, Acting P. J.

WE CONCUR:

HALLER, J.

McDONALD, J.